Lorrie E. Bradley (SBN 309411)
Peter M. McEntee (SBN 252075)
**BEESON, TAYER & BODINE**
492 Ninth Street, Suite 350
Oakland, CA 94607
(510) 625-9700
lbradley@beesontayer.com
pmcentee@beesontayer.com

*Counsel for Plaintiffs*

[Additional co-counsel on signature page]

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL-CIO; SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO; MAIN STREET ALLIANCE; UNITED DOMESTIC WORKERS OF AMERICA, AFSCME LOCAL 3930; AFSCME COUNCIL 31; AFSCME COUNCIL 57,<br><br>     *Plaintiffs*,<br><br>     v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the U.S. Department of Health and Human Services; ADMINISTRATION FOR CHILDREN AND FAMILIES; *and* ALEX J. ADAMS, in his official capacity as Assistant Secretary of the Administration for Children and Families,<br><br>     *Defendants*. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**Administrative Procedure Act Case** |

COMPLAINT

Plaintiffs are labor organizations and a small business membership organization that collectively represent tens of thousands of child care providers whose essential services for low-income families are funded by federal grant subsidies throughout California, Colorado, Illinois, Minnesota, and New York; state and local government employees who perform the essential public service of administering those subsidy programs; and parents and caregivers who receive these critical child care subsidies for their own families as well. Plaintiffs are the American Federation of State, County, and Municipal Employees, AFL-CIO ("AFSCME"); Service Employees International Union, AFL-CIO ("SEIU"); Main Street Alliance ("MSA"); United Domestic Workers of America, AFSCME Local 3930 ("UDW"); AFSCME Council 31; and AFSCME Council 57, (collectively, "Plaintiffs") and they bring this complaint against the U.S. Department of Health and Human Services, Administration for Children and Families, and their officers, as outlined below, seeking declaratory and injunctive relief to enjoin these Defendants from continuing to use the unlawful freeze of federal funds supporting child care and supportive services for low-income families in a manner not authorized by law to threaten and punish their perceived political opponents. Plaintiffs hereby allege as follows:

## INTRODUCTION

1. Affordable, quality child care is essential for working families to thrive. Yet it is profoundly hard to come by, with the cost of care outpacing wages for over a decade, often taking 20% or more of a family's income, and, for infants, frequently exceeding the cost of public college tuition. At an average of nearly $1,000 per month per child, it is simply out of reach for many families. Federal funding provides a crucial stopgap, allowing states to subsidize eligible families' costs, so that those parents can work or go to school.

2. Nevertheless, Defendants—HHS, the Administration for Children and Families ("ACF"), and their leadership—decided to cut off this crucial funding to punish disfavored states, their perceived enemies, and political opponents.

3. Specifically, on January 6, 2026, Defendants announced that they were broadly "freezing" three critical child care and family assistance funding programs to five states—California,

Colorado, Illinois, Minnesota, and New York (the "Targeted States")—and no others. Those funds include: (1) **nearly $2.4 billion in Child Care and Development Fund ("CCDF")** to help states support child care for low-income working families; (2) **$7.35 billion in Temporary Assistance for Needy Families ("TANF")** to help states fund programs for low-income families, including job assistance and child care; and (3) **$869 million in Social Services Block Grant ("SSBG")**, including child welfare programs and education and job training for adults. Defendants will not release these funds until the states submit to onerous demands for documentation to justify their spending.

4.      Defendants assert, without evidence that the freeze ("Child Care Funding Freeze"), is due to "serious concerns about widespread fraud and misuse of taxpayer dollars in state-administered program." Even if there were such widespread, ongoing fraud (a baseless claim), Defendants have no statutory or regulatory authority to impose a unilateral freeze. To the contrary, congressional direction and implementing regulations forbid HHS from unilaterally deciding to terminate subsidies under these programs. Defendants cannot circumvent these directives by withholding all funding to the Targeted States and their residents until those states comply with onerous demands for voluminous information.

5.      Defendants have failed to provide any reasonable explanation, nor could they, for targeting the residents of these states, making the Freeze arbitrary and capricious. HHS has vaguely asserted that these states are "where our highest suspicion is." But if HHS wished to pursue such a "suspicion," it could (and, as explained below, legally must) do so without unilaterally withholding funding or otherwise penalizing families who depend on these programs' promise of affordable child care. And nowhere did HHS account for the widespread and intense reliance interests of families and child care providers that rely on these subsidies.

6.      The lawlessness of Defendants' actions extends further though. The President and his administration have repeatedly leveraged their control over the immense federal budget to target their perceived political enemies. Just yesterday reporting revealed a new OMB directive that agencies undertake an intensive review of all funding to Democratic-led states for potential cuts. Here too it is plain that Defendants' actual purpose is to punish Democratic-led states and their citizenry by

depriving many of those households of access to affordable child care. This violates the core constitutional requirements of free speech, association, and equal protection.

7.     Additionally, Defendants' unilateral decision to impose a categorical freeze on congressionally appropriated funds exceeds authorizing statutes and implementing direction and implementing regulations that forbid HHS from unilaterally deciding to terminate subsidies under these programs. Defendants cannot circumvent these directives by withholding all funding to the Targeted States and their residents until those states comply with onerous demands for voluminous information.

8.     Defendants' Child Care Funding Freeze jeopardizes programs serving hundreds of thousands of low-income households in the five Targeted States. It will irreparably harm Plaintiffs and Plaintiffs' members, as well as others who rely on these funds for child care and social services. Even a brief delay of the funds at issue for day care centers, which already operate on shoestring budgets, will leave funding gaps that will force programs to shutter or scale back significantly— stripping child care and other critical support from the people who rely on it. Parents depend on these child care programs to work or attend school, and to provide their young children with the benefit of high-quality early care experiences.

9.     The Child Care Funding Freeze violates the Administrative Procedure Act ("APA") and the Constitution, and it must be set aside.

## PARTIES

### A.     Plaintiffs

10.     Plaintiff **American Federation of State, County, and Municipal Employees, AFL-CIO ("AFSCME")** is a labor organization and unincorporated association headquartered in Washington, D.C.

11.     AFSCME is the largest trade union of public employees in the United States, with 1.4 million members organized into approximately 3,400 local unions, 58 councils and affiliates in 46 states, the District of Columbia, and Puerto Rico. AFSCME members include nurses, corrections officers, child care providers, emergency medical technicians, sanitation workers, school bus drivers,

civil engineers, policy analysts, and more, all with one thing in common: a dedication to making our communities stronger, healthier, and safer.

12.     AFSCME's members are harmed by the funding freeze in numerous ways. AFSCME has as members nearly 20,000 independent child care providers whose caregiving work is directly funded by the frozen funds at issue, which subsidize low-income American families who receive the essential care from AFSCME's members. AFSCME also represents state and local government employees in numerous agencies and departments that administer the funds at issue in all five Targeted States. Many AFSCME members also utilize and rely on government services that are funded by the federal government, including subsidized child care services at issue in this case.

13.     Under the AFSCME International Constitution, AFSCME Affiliates include AFSCME councils, AFSCME locals, and unions that have joined AFSCME through a direct affiliation. Under the AFSCME International Constitution, all members of AFSCME Affiliates are members of both the AFSCME Affiliate and AFSCME International, and pay voluntary membership dues, a portion of which are remitted to the AFSCME Affiliate and a portion to AFSCME International.  AFSCME has, and asserts here, both associational standing to represent the rights and interests of its individual members as well as organizational standing to address the harms to AFSCME as an entity due to the Child Care Funding Freeze.

14.     Plaintiff **Service Employees International Union AFL-CIO ("SEIU")** is a labor organization of approximately two million working people united by the belief in the dignity and worth of workers and the services they provide. SEIU strives for a just society in which all workers, families, and communities can thrive. Every day, SEIU members educate and care for children, deliver vital public services such as TANF, provide patient care, help seniors and people with disabilities live independently, and keep our communities clean, safe, and healthy. SEIU members work in a wide variety of settings including child care centers, preschools, in-home child care settings, schools and universities, government offices, hospitals and nursing homes, airports, libraries, and commercial office buildings, just to name a few. SEIU is headquartered in Washington, D.C., and has over 150 affiliates across the United States, Canada, and Puerto Rico, including in all five Targeted

States. In California, specifically, SEIU and its 17 affiliates represent approximately one million workers in 58 counties across the state, including over 51,000 family child care providers. In the Northern District of California, SEIU and its affiliates represent over 200,000 workers. SEIU brings this case on behalf of its members who are child care providers serving families enrolled in federally-subsidized child care programs; state and local employees at agencies responsible for administering child care and family assistance programs funded by CCDF, TANF and/or SSBG; and working parents and caregivers reliant on subsidies to access affordable child care. All members of SEIU local union affiliates are also members of SEIU. SEIU members pay voluntary membership dues to their local unions, a portion of which are remitted to SEIU.

15.     Plaintiff **Main Street Alliance ("MSA")** is a national network of small businesses that represents approximately 30,000 small businesses across the United States. MSA seeks to amplify the voices of its small business membership by sharing their experiences with the aim of creating an economy where all small business owners have an equal opportunity to succeed. It is headquartered in North Bethesda, Maryland.

16.     Plaintiff **United Domestic Workers of America, AFSCME Local 3930 ("UDW")** is a direct affiliate of AFSCME committed to ending systemic inequality and building better lives for its members, their families, and the people they serve. UDW collective bargaining agreements ("CBAs") with the State of California cover more than 220,000 home care and child care providers across the state. UDW represents approximately 25,000 independent child care providers in California whose work is funded in whole or in part by the frozen funds at issue in this case; approximately 8,000 of those providers are dues-paying members of UDW. UDW child care provider members are also members of Child Care Providers United ("CCPU"), which is a partnership between AFSCME and Plaintiff SEIU. CCPU has negotiated a CBA with the state of California that covers independent child care providers who serve families on subsidies. UDW represents child care providers who reside and work in this district, including in San Francisco, California.

17.     Plaintiff **AFSCME Council 31** is a subordinate body of AFSCME representing employees throughout the state of Illinois, including both state and local government public

employees. Council 31 represents care workers, correctional officers, maintenance workers, school bus drivers, clerical workers, social workers, nurses, lawyers, doctors, probation officers, and other public servants in Illinois. Among Council 31's members are state employees of the Illinois Department of Human Services ("IDHS") and Illinois Department of Child and Family Services ("ICDFS"), which administer part of the federal CCDF, TANF, and SSBG money. AFSCME Council 31 also represents employees of child care programs that rely on those funds to operate, as well as individual members who themselves qualify for and receive the child care subsidies at issue in this case.

18.    Plaintiff **AFSCME Council 57** is a subordinate body of AFSCME International and comprises 26 local unions representing 35,000 members throughout Northern California and the Central Valley. Established in 1963, the Council was formed as a progressive, member-driven labor organization dedicated to empowering and securing dignity and respect for all workers. AFSCME Council 57 and its members work together to improve wages, benefits and working conditions through organizing, collective bargaining, and political action. AFSCME Council 57 represents workers in schools and community colleges, transit agencies, city and county public works and services, clinics and hospitals, and water and wastewater facilities.  Among AFSCME Council 57's members are public employees who administer the federal funding at issue in this case. AFSCME Council 57 is headquartered in this district at 80 Swan Way, Suite 110, Oakland, CA 94621.

**B.    Defendants**

19.    Defendant **U.S. Department of Health and Human Services ("HHS")** is a federal agency headquartered in Washington, D.C. HHS is an agency within the meaning of the APA.

20.    Defendant **Robert F. Kennedy, Jr.**, is the Secretary of HHS and is sued in his official capacity.

21.    Defendant **Administration for Children and Families ("ACF")** is a federal agency headquartered in Washington, D.C.  It is a component of HHS. ACF is an agency within the meaning of the APA.

22.    Defendant **Alex J. Adams** is the Assistant Secretary of ACF and is sued in his official capacity.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq*., and 5 U.S.C. §§ 702, 704.

24.    An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201–2202, 5 U.S.C. §§ 705–706, and the Court's inherent equitable powers.

25.    Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and (e)(1) because Plaintiff AFSCME Council 57 is headquartered in this district. Additionally, Plaintiffs AFSCME, SEIU, and AFSCME Council 57 represent state and local government employees whose place of employment is within the Northern District of California. Plaintiffs AFSCME and SEIU also represent independent child care providers who operate child care businesses in this district, serving low-income subsidized families affected by the freeze at issue in this case. Plaintiff MSA represents small businesses that are located within the Northern District of California. A substantial part of the events or omissions giving rise to these claims occurred in the Northern District of California, Defendants are officers and agencies of the United States served in their official capacities, no real property is at issue in this case, and Plaintiffs represent members who are citizens of California and residents of this District, where many of the harms alleged have occurred and will continue to occur unless Defendants' alleged unlawful conduct is enjoined.

26.    Intradistrict assignment is appropriate in the San Francisco/Oakland Division of this Court, which is where AFSCME Council 57 is headquartered.

**FACTUAL ALLEGATIONS**

**I.    The Targeted Funding Programs Provide Critical Support to Plaintiffs' Members and Communities.**

27.    There are three programs under threat in this case: (1) the Child Care and Development Fund, (2) Temporary Assistance for Needy Families, and (3) Social Services Block Grants. Each of these programs provides critical assistance to families and children in need, individuals with disabilities, and vulnerable older Americans.

**A.    The Child Care and Development Fund ("CCDF")**

28.    CCDF serves nearly 1.4 million low-income children and about 850,000 families monthly, enabling parents to work or attend school. This fund prioritizes services for children and families with very low incomes. Most families served have incomes below the Federal Poverty Level, with a significant portion of families with incomes between 100 percent and 150 percent of the Federal Poverty Line. This funding is intended to subsidize child care expenses for qualifying families and to improve the overall quality and supply of child care. CCDF also supports teacher training and development, as well as programming and consumer education that educates parents about child care options. CCDF funding is distributed to state-designated "lead agencies," which in turn distribute the funding to subrecipients, including Plaintiffs' members.

29.    CCDF is administered by HHS and is made up of two separate sources of funding: the Child Care Entitlement to States ("CCES") and the Child Care and Development Block Grant ("CCDBG").

30.    CCES is a statutory entitlement that is not subject to the annual appropriations process. Rather, Congress determined that "each State shall, for the purpose of providing child care assistance, be entitled to payments" in an amount calculated based on sums paid to the state between 1992 and 1995. 42 U.S.C. § 618(a)(1).

31.    CCDBG is subject to the annual appropriations process. By statute, the allocation and payment of those funds to States is mandatory: Under 42 U.S.C. § 9858h, "a State that has an application approved by the Secretary . . . shall be entitled to a payment under this section for each

COMPLAINT

8

fiscal year in an amount equal to its allotment under" 42 U.S.C. § 9858m. That section, in turn, lays out a mandatory formula for allocation of CCDBG funding for each State.

32.    For 2025, Congress directed that $2.4 billion in federal funding would be provided to the Targeted States through CCDF: $1.09 billion to California, $140 million to Colorado, $412 million to Illinois, $185 million to Minnesota, and $638 million to New York. *GY2025 CCDF Funding Allocations (Based on Appropriations),* HHS, Off. of Child Care, https://perma.cc/X2ZJ-YR7C.

33.    Congress requires that, in order to receive this funding, each state must "prepare and submit" a "State plan" that certifies that the state has certain procedures and protections in place and describes the state's training and professional development requirements, child care standards (including child-to-provider ratio), and health and safety requirements, among other requirements. 42 U.S.C. § 9858c. The statute further directs that the HHS Secretary "shall approve" any application that meets these requirements. *Id.*

34.    The states administer their CCDF funding program in accordance with their respective federally approved state plan. Each state sets payment rates for child care providers. Participating families may enroll their child with a provider who has a grant or contract with the state or they may receive a certificate to purchase child care from an eligible provider of their choice.

**B.    Temporary Assistance for Needy Families ("TANF")**

35.    TANF is a block grant program that helps fund state-run initiatives providing cash assistance and a range of other benefits and services for needy families with children, including child care assistance, employment and training programs, services for children at risk of neglect or abuse, and after-school youth programs. *See* Gene Falk, Cong. Rsch. Serv., R48413, *Temporary Assistance to Needy Families (TANF) Block Grant: A Primer* (Dec. 18, 2025), https://perma.cc/2VLK-RJZB ("TANF Primer").  It is one of the largest sources of cash assistance to low-income American families and a crucial component of helping families with children achieve economic security and stability.

36.    TANF funds are allocated according to a mandatory formula based on the share each State had of TANF funding in 2002. 42 U.S.C. § 603(a)(1) ("Each eligible State shall be entitled to receive…"). The 2002 allocations were based on a formula created in the 1996 Personal

Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), under which allocations were calculated based on shares of different program expenditures from 1992-1995. TANF Primer at 2 n.6.

37.     Congress appropriated $16,566,542,000 to TANF in the Continuing Appropriations and Extensions Act. Pub. L. No. 119-37, 139 Stat. 497 (2025); Pub. L. No. 118-42, 138 Stat. 418 (2024); 42 U.S.C. § 603(a)(1)(C).

38.     In FY 2023, Congress allocated more than $7 billion to the Targeted States: $3.6 billion to California, $135 million to Colorado, $583 million to Illinois, $260 million to Minnesota, and $2.4 billion to New York. TANF Primer at 3-4.

39.     A State is eligible for TANF funding if it submits to the Secretary a plan outlining how the State will conduct the TANF program in compliance with federal work requirements, privacy protections, and other provisions. 42 U.S.C. § 602(a). As with their CCDF programs, States administer their TANF program consistent with their federally approved state plan.

**C.     Social Services Block Grant ("SSBG")**

40.     The SSBG program is a funding source providing approximately $870 million annually to the Targeted States to provide them with "flexibility" and funding to support social services in one of five categories: (1) "achieving or maintaining economic self-support"; (2) "achieving or maintaining self-sufficiency"; (3) addressing "neglect, abuse, or exploitation" of children and vulnerable adults; (4) preventing institutional care and supporting community-based care; and (5) where institutional care is needed, supporting application and admission and providing services to institutionalized individuals. 42 U.S.C. § 1397.

41.     Congress requires that SSBG funds must be allocated based on each State's percentage of the national population, based on census data. 42 U.S.C. § 1397b(b). Payment of this funding to the States is not optional. 42 U.S.C. § 1397a provides that "[e]ach State shall be entitled to payment under this division for each fiscal year in an amount equal to its allotment," and that "[t]he Secretary shall make payments . . . to each State[.]"

42. Unlike CCDF and TANF, States are not required to submit a plan to be eligible for SSBG funding. Instead, Congress opted to require an annual report describing how the state used the funds in the year prior. 42 U.S.C. § 1397e; *see also* 45 C.F.R. § 96.74.

43. In FY 2024, Congress appropriated $1.7 billion for SSBG. Pub. L. No. 118-47, 138 Stat. 665 (2024). FY 2025 and current funding was continued at that level. Pub. L. No. 118-83, 138 Stat. 1533 (2024); Pub. L. No. 119-37, 139 Stat. 497 (2025).

## II. Defendants' Threats Against the Five Targeted States and Their Residents

44. Over the past year, the administration has repeatedly sought to use federal funding as a tool to threaten and punish its perceived political opponents. *See, e.g.*, Tony Romm, *Trump Seizes On Shutdown to Punish Political Foes*, N.Y. Times (Oct. 4, 2025), https://perma.cc/H5YY-UHF4 (describing President Trump's "legally dubious campaign to weaponize the federal budget . . . in a bid to punish Democratic-led cities and states"); Donald Trump (@realDonaldTrump), *Truth Social* (Nov. 3, 2025, at 5:16 PM ET), https://perma.cc/HL26-9EYJ (threatening to withhold federal funds from New York City if it elected the Democratic candidate for mayor); *Am. Acad. of Pediatrics v. HHS*, No. 25-cv-4505, 2026 WL 80796, at *21 (D.D.C. Jan. 11, 2026) (finding that Defendant HHS had likely terminated plaintiff's grants in retaliation for plaintiff's protected First Amendment activities critical of the administration); *Am. Bar Ass'n v. Dep't of Just.*, 783 F. Supp. 3d 236, 246 (D.D.C. 2025) ("The ABA has made a strong showing that Defendants terminated its grants to retaliate against it for engaging in protected speech.").

45. Indeed, the administration has admitted in litigation to terminating federal grants purely because the recipients were located in "blue states." *See* Meryl Kornfield & Hannah Natanson, *Trump Administration Admits to Targeting Blue States for Energy Grant Cuts*, Wash. Post (Dec. 17, 2025), https://perma.cc/93FL-S9X5 (noting court filing in which administration conceded it had targeted Democratic-run states for grant cuts).

46. Even before taking office, President Trump threatened to withhold federal funding from disfavored states and elected officials, saying of California Governor Newsom, for example, that if he did not "take care of [the state's] water situation," "we'll force it down his throat." Hannah

Knowles et al., *Trump's threat to place conditions on fire aid outrages Democrats*, Wash. Post (Jan. 15, 2025), https://perma.cc/T8LA-UK3P/. "And we'll say: Gavin, if you don't do it, we're not giving you any of that fire money that we send you all the time for all the fire, forest fires that you have." *Id.*

47.    The administration has previously singled out funding in New York and Illinois as well, for example freezing $18 billion in infrastructure money for New York, *see* Brian Mann, *Trump freezes $18 billion in funding for NYC, home to key Democratic leaders*, Politico (Oct. 1, 2025), https://perma.cc/5TF9-GM6Z, and billions more for projects in Chicago, Julie Bosman, *White House Suspends $2.1 Billion in Funding for Chicago Transit Projects*, N.Y. Times (Oct. 3, 2025), https://perma.cc/LE66-FFJC.

48.    The administration has likewise sought to choke off numerous sources of federal funding to recipients in Colorado, following a dispute with Governor Jared Polis over President Trump's attempts to pardon his supporter and former Mesa County Clerk Tina Peters. Among other retaliatory cuts, the administration announced plans to shutter a major climate research center in the state, Lisa Friedman et al., *Trump Administration Plans to Break Up Premier Weather and Climate Research Center*, N.Y. Times (Dec. 17, 2025), https://perma.cc/4LRP-N8F5, and President Trump vetoed funding for a clean-water pipeline he had once supported, Jack Healy, *A Trump Veto Leaves Republicans in Colorado Parched and Bewildered*, N.Y. Times (Jan. 17, 2026), https://perma.cc/WZ82-494L. Even the administration's political allies have suggested it is acting out of "political retaliation." Maegan Vazquez and Kadia Goba, *Longtime MAGA ally Boebert lashes out at Trump over veto*, Wash. Post (Dec. 31, 2025), https://perma.cc/XY9L-V86D.

49.    More recently, the administration ordered a "sweeping review" by multiple agencies of essentially all federal funding sent to over a dozen Democratic-run states—including all five of the Targeted States—but not to any Republican-led states. Hannah Rabinowitz et al., *Trump administration targets 14 blue states with sweeping federal funding review*, CNN (Jan. 22, 2026), https://perma.cc/D9UN-6T6A.

50.    Consistent with that pattern, beginning in late-November, Defendants began to use pretextual, vague, and unsubstantiated allegations of "fraud" in the five Democratic-led Targeted

States to seed the groundwork for their illegal termination of $10 billion in CCDF, TANF, and SSBG funding.

51.    Beginning in November 2025, the administration began drawing attention to a COVID-19 era fraud scheme that had previously been investigated and prosecuted in Minnesota. *See* Press Release, Dep't of Just., U.S. Attorney Announces Federal Charges Against 47 Defendants in $250 Million Feeding Our Future Fraud Scheme (Sept. 20, 2022), https://perma.cc/6X6V-PPUX.

52.    Even though Minnesota was the entity to identify the fraud, refer it to federal officials, and cooperate fully in the prosecution, President Trump and others within the administration have repeatedly used pretextual concern about this fraud to justify a number of aggressive actions taken against Minnesota and other Targeted States.

53.    In December 2025, ACF directed a number of demands to Minnesota to produce the "complete universe" of data for a number of programs, including CCDF, TANF, and SSBG. *See* Exs. 5–6, 17–18. Some of those general, boilerplate letters would ultimately be copied and pasted into letters later sent to the other four Targeted States. Minnesota confirmed receipt of the bevy of ACF's December data demands and indicated it would respond on January 9, 2026.

54.    In late December 2025, a 23-year-old YouTuber shared a video that purported to expose several child care centers in Minnesota engaging in fraud, focusing blame heavily on Minnesota's Somali community. Zoe Sottile & Andy Rose, *Minnesota investigators say child care centers accused of fraud are operating normally as governor drops reelection bid*, CNN (Jan. 5, 2026), https://perma.cc/E9PN-B6GH. The video was the focus of conservative news coverage and then was promoted by Vice President J.D. Vance and former presidential advisor Elon Musk. A White House spokesperson stated that "the country should be deeply appreciative to" the YouTube creator "for shining a light on this issue." Ken Bensinger & Ernesto Londoño, *An Intense White House Response from a Single Viral Video*, N.Y. Times (Dec. 31, 2025), https://perma.cc/7SBS-GY5D.

55.    In response to the YouTube video, on December 30, 2025, HHS Deputy Secretary Jim O'Neil issued a video announcement stating that HHS was freezing Minnesota's CCDF funding, claiming, "[w]e have frozen all child care payments to the state of Minnesota." Deputy Secretary Jim

O'Neill (@HHS_Jim), X (Dec. 30, 2025, 5:51 PM), https://perma.cc/55VM-97V2. In the same post, he announced that "all ACF payments across America" would "require a justification and a receipt or photo evidence" before funds could be disbursed to States.  The post concluded: "[w]e have turned off the money spigot and we are finding the fraud."

56.    Late on December 30, 2025 (hours after HHS made its announcement on social media), ACF directed written communication to Minnesota to memorialize its social media announcement. That correspondence appears to reference the YouTube video (described as "[r]ecent viral reports") as support for an expanded data demand for an even broader scope of CCDF and TANF data. Ex. 6 at 1. The letter purported to set a January 9, 2026, deadline for the broader scope of records to be produced. However, the letter also announced immediate action to be taken even before that unreasonable deadline, stating that "Minnesota will be placed on a temporary restricted drawdown for all CCDF funds provided by ACF until further notice, with specific instructions for these restrictions to be provided by January 5th, 2026." *Id.* at 3.

57.    Over the next several days and culminating in correspondence sent January 5 and 6, 2026, Defendants accelerated their strategy to achieve their ultimate end: imposing sweeping and unlawful restrictions on CCDF, TANF, and SSBG funding to the Targeted States and their residents.

58.    On December 31, 2025, HHS spokesperson Andrew Nixon stated there would be a categorical freeze of federal child care funding to all states, and that those funds would only be released "when states prove they are being spent legitimately." *HHS freezing childcare payments to all states until they prove funds 'being spent legitimately'*, ABC News (Dec. 31, 2024), https://perma.cc/7FA5-4684.

59.    Defendants did not freeze funds to all states. They instead engaged in a set of targeted attacks on critical funding that Congress appropriated to five Democratic-led states and their residents.

60.    President Trump repeatedly made clear the political nature of the targeting. On December 31, 2025, during a New Year's Eve party at Mar-a-Lago, President Trump said, "[w]e want to take back our country. Can you imagine? They [Somali-Americans] stole 18 billion dollars. That's

just what we're learning about, that's peanuts. California is worse, Illinois is worse, and sadly, New York is worse, a lot of other places, so we're going to get to the bottom of all of it." *Remarks: Donald Trump Conducts a Live Auction at His New Year's Eve Party*, Roll Call (Dec. 31, 2025), https://perma.cc/7NTJ-2KBY.

61.    On January 4, 2026, President Trump threatened to retaliate against Democratic governors, saying, "[b]ut think of it, $19 billion at least they [Somali-Americans] have stolen from Minnesota and from the United States . . . . And we're not going to pay it anymore. We're going to have [Minnesota Governor Tim] Walz go pay. We're not going to pay them, and we're not going to pay California, and we're not going to pay Illinois with a big slob of a governor that they have." The White House, *President Trump Gaggles with Press on Air Force One*, at 19:17 (YouTube, Jan. 4, 2026), https://www.youtube.com/watch?v=9XVjd3R2T3g&t=1157s.

62.    On January 5, 2026, President Trump reiterated his focus on the political leadership of the Targeted States: "Governor Walz has destroyed the State of Minnesota, but others, like Governor Gavin Newscum, JB Pritzker, and Kathy Hochul, have done, in my opinion, an even more dishonest and incompetent job. NO ONE IS ABOVE THE LAW!" Donald Trump (@realDonaldTrump), *Truth Social* (Jan. 5, 2026, at 2:13 PM ET), https://perma.cc/PC25-UDED.

63.    On January 5, 2026, an HHS spokesperson made an even more direct, false assertion that "Democrat-led states and Governors have been complicit in allowing massive amounts of fraud to occur under their watch." Adora Brown & Raymond Fernandez, *Trump Admin. to Freeze $10B in Social Programs to New York and Other Dem States*, The City (Jan. 6, 2026), https://perma.cc/SZN8-PTMS.

64.    Defendants carried out these threats against the Targeted States on January 5 and 6.

65.    On January 5, 2026, news broke that the Trump administration was "cutting off more than $10 billion in social services and child care funding meant for a handful of Democrat-led states over concerns that the benefits were being fraudulently funneled to non-citizens." Josh Christensen, *Exclusive: Trump cuts off $10B in funding to five blue states for child care, social services over fraud fears*, N.Y. Post (Jan. 6, 2026), https://perma.cc/NEP3-SKJW.

66.     On January 6, 2026, President Trump reiterated that he was specifically targeting the Democratic governor of California, stating, "California, under Governor Gavin Newscum, is more corrupt than Minnesota, if that's possible??? The Fraud Investigation of California has begun. Thank you for your attention to this matter! President DONALD J. TRUMP." Donald Trump (@realDonaldTrump), *Truth Social* (Jan. 6, 2026, at 8:21 AM ET), https://perma.cc/W9JB-Q9YU.

67.     The overtly partisan attacks did not stop after the funding freeze. On January 8, 2026, the HHS General Counsel posted a link to news coverage of the States' lawsuit challenging ACF's funding freeze, accusing "Attorney Generals from these Democrat-led states" of a "partisan political stunt[]" and being "complicit in . . . perpetuation of" some unspecified "fraud" at the expense of "real Minnesotans." HHS General Counsel Mike Stuart (@HHSGCMikeStuart), X (Jan. 8, 2026), https://perma.cc/4UAW-3977.

## III.    Defendants Freeze $10 Billion in Critical Funding to Residents in the Targeted States

68.     On January 6, 2026, Defendants announced a $10 billion "funding freeze," stating that they had "froze[n] access to certain federal child care and family assistance funds for California, Colorado, Illinois, Minnesota, and New York." Press Release, HHS, HHS Freezes Child Care and Family Assistance Grants in Five States (Jan. 6, 2026), https://perma.cc/2NWJ-DYLA. Specifically, Defendants froze funding for the CCDF, TANF, and SSBG programs and stated that the Targeted States'—and thus downstream recipients'—"access to these funding streams is now restricted." *Id.*

69.     Defendants claimed this action was taken based on unspecified "serious concerns about widespread fraud and misuse of taxpayer dollars in state-administered programs." *Id.*

70.     Defendants also claimed that they had "identified concerns that these benefits intended for American citizens and lawful residents may have been improperly provided to individuals who are not eligible under federal law." *Id.*

71.     According to Defendants, "[f]unds will remain frozen in this fashion until ACF completes a review and determines that states are in compliance with federal requirements." *Id.*

72.     Defendants stated that the funding freeze was effectuated via letters sent to the governors of the Targeted States.

73.    Between January 5, 2026, and January 6, 2026, Defendants sent letters to each of the Targeted States notifying them that funding to the CCDF, TANF, and SSBG programs would be immediately frozen. Exs. 1–4, 7–16.

74.    The letters are largely identical, swapping out only the recipients and States' names. The letters claim that Defendants are "concerned by the potential for extensive and systemic fraud"; that these purported concerns "have been heightened by recent federal prosecutions and additional allegations that substantial portions of federal resources were fraudulently diverted away from the American families they were intended to assist"; and that "ACF has reason to believe that" each state "is illicitly providing illegal aliens with . . . benefits intended for American citizens and lawful permanent residents." *See, e.g.*, Ex. 1 at 1.

75.    None of the letters sent on January 5, 2026, or January 6, 2026, identify a single "prosecution" related to the frozen funds, adduce or support any "allegations" of fraudulent diversion of funds, or cite any evidence or "reason to believe" that any state is "illicitly providing illegal aliens" with those funds. *See, e.g.*, *id.*

76.    These letters do not explain why the Targeted States were singled out over others.

77.    In a recent court filing, the Deputy Assistant Secretary for Management at ACF stated that ACF "became concerned about potential fraud in the states of California, Colorado, Illinois, and New York" "[i]n early January 2026"—i.e., just days before acting to shut off billions of vital funds to these states and their residents.

78.    When asked how the Targeted States had been selected, HHS spokesperson Andrew Nixon provided no reasoned explanation nor cited any evidence that would justify targeting those states, but simply said, "[t]hat's where our highest suspicion is." Emily Peck, *Trump administration to freeze billions in childcare funding in five states*, Axios (Jan. 5, 2026), https://perma.cc/2FLN-NVWY.

79.    The letters demand copious information from each of the states, such as, for example, "the complete universe of TANF administrative data that exist and are in the state's possession for all

recipients for all available years," including "recipient name, address, Social Security Number (if collected), date of birth," and more. *See, e.g.*, Ex. 1 at 2.

80.     The letters inform the states that they will be "placed on [a] temporary restricted drawdown"—meaning, unable to draw funds under any of the three programs—until further notice. *See, e.g.*, *id.*

**IV.    Defendants' $10 Billion Freeze of Critical Funding Is Contrary to Law and Unauthorized by Statute**

81.     For each of the three programs at issue, Congress provided a detailed statutory and regulatory scheme requiring Defendants to follow specified procedures before imposing sanctions for noncompliance with program requirements. Likewise, each program's governing laws and regulations set forth what data Defendants may collect and the manner in which they may collect it.

82.     Congress did not provide Defendants with any authority to freeze all funds to an entire state and its residents, regardless of the basis. Quite the opposite. The only statutory or regulatory bases under which Defendants can reduce a state's funding first require Defendants to make findings of noncompliance in a state's administration of its programs, and such penalties can only be imposed in accordance with robust statutory and regulatory procedures set forth for each program.

83.     Defendants did not follow any of the statutorily and regulatory required procedures prior to freezing $10 billion in congressionally mandated funding to the Targeted States.

**A.    CCDF Procedures**

84.     By statute, Defendants may implement a penalty against a state for noncompliance in the CCDF program only after providing reasonable notice and the opportunity for a hearing. 42 U.S.C. § 9858g(b)(2)(A)–(B).

85.     Defendants can do so only after they follow specific procedural steps. First, they must conduct a "review or investigation [that] reveals evidence that" a state or its subgrantee "has failed to substantially comply with" applicable law or regulations, or receives a complaint that a state "has failed to use its allotment in accordance with" law or regulations. 45 C.F.R. §§ 98.90(b), 98.93(a).

86.    Defendants must then "issue a preliminary notice . . . of possible non-compliance" to the state. 45 C.F.R. § 98.90(b). If the possible non-compliance is based on a complaint, Defendants must "promptly furnish a copy of any complaint to the affected" state. 45 C.F.R. § 98.93(c).

87.    A state then has a sixty-day period to submit comments. 45 C.F.R. §§ 98.90(b), 98.93(c). Defendants must then consider the state's comments. *Id.*

88.    If Defendants make a finding that the state has made expenditures that are not allowed by law, it must notify the state in writing of its decision to disallow those expenditures. 45 C.F.R. § 98.66(b).

89.    During this process, the state has two opportunities to appeal. If Defendants make a finding of non-compliance as part of a compliance review, the state may appeal that decision. 45 C.F.R. § 98.66(i). If Defendants make a decision to disallow funds, the state may request reconsideration of, or appeal, that decision. 45 C.F.R. § 98.66(c).

90.    Upon a final decision, the sanction for the state is disallowance of funds in the specific amount found to be paid not in accordance with law or an offset of future payments in that same amount. 45 C.F.R. § 98.65(d), *see also* 45 C.F.R. §§ 98.66(a), (h). Defendants may also impose other "appropriate sanctions." 45 C.F.R. § 98.92(b).

91.    Defendants did not take any of the required procedural steps before freezing the Targeted States' CCDF funds.

92.    The CCDF letters do not acknowledge any of these statutory or regulatory obligations. The only legal citation in the CCDF letters is to 45 C.F.R. § 98.67(c)(2), which simply requires states to have "[f]iscal control and accounting procedures . . . sufficient to permit . . . [t]he tracing of funds to a level of expenditure adequate to establish that such funds have not been used in violation of the provisions of this part."

93.    CCDF statutes and regulations prescribe a number of ways in which Defendants monitor states' compliance with program requirements, including potential fraud, and the manner in which data and records can be provided from states to Defendants. For example, Congress has specified that each state must undergo regular audits; must report certain data regularly; and must

undergo a quality control process through which Defendants calculate the rate of improper payments. *See* 42 U.S.C. § 9858(i); 45 C.F.R. §§ 98.65, 98.100.

94.    Defendants likewise did not acknowledge any of these oversight mechanisms before freezing CCDF funds.

**B.    TANF Procedures**

95.    The TANF statute provides specific and exclusive circumstances in which Defendants may implement a penalty against a state for noncompliance in the TANF program, including a state's failure to submit required reports, failure to comply with child support enforcement obligations, and a "[g]eneral penalty" for when a state's statutorily required audit finds that a state's funds have been used in violation of the law. 42 U.S.C. § 609(a); 45 C.F.R. § 263.10.

96.    Defendants must follow specific procedures in order to implement these penalties. *See* 42 U.S.C. § 617 ("No officer or employee of the Federal Government may regulate the conduct of States under" the TANF program "except to the extent expressly provided in this part.").

97.    First, Defendants must notify a state of the violation. 42 U.S.C. § 609(c)(1)(A). This notification must be in writing; it must specify which penalty will be imposed and the reasons for the penalty; it must specify the sources of information Defendants relied on and the reasons for its decision; and it must invite the state to present its arguments if it believes that the information or method that Defendants used were in error or were insufficient. 45 C.F.R. § 262.4(a).

98.    The state then has a sixty-day period to submit a corrective compliance plan that outlines how the state will correct or discontinue the violation and how the state will ensure continuing compliance. 42 U.S.C. § 609(c)(1)(A)-(B).

99.    Defendants have a sixty-day period to accept or reject the state's proposed compliance plan. 42 U.S.C. § 609(c)(1)(D).

100.    Only if Defendants reject the state's proposed compliance plan within 60 days can Defendants impose penalties on the state. 42 U.S.C. § 609(c)(1)(D), (c)(2); *see also* 42 U.S.C. § 609(c)(3).

101.    If Defendants take any adverse action against a state—which may include the imposition of a penalty as described above but may also include an adverse action on the state's TANF plan— Defendants must notify the state within five days. 42 U.S.C. § 610(a). This notification must include "the factual and legal basis for taking the penalty in sufficient detail for the State to be able to respond in an appeal." 45 C.F.R. § 262.7(a)(2).

102.    The state has 60 days to appeal. 42 U.S.C. § 610(b)(1).

103.    Upon a final decision, the penalty for the state is a reduction in future payments to the state in the amount that was unlawfully spent. 42 U.S.C. § 609(a)(1)(A). Defendants are limited to imposing an additional 5% reduction in payments to the state if it finds that the state's violation was intentional. 42 U.S.C. § 609(a)(1)(B).

104.    Congress prohibited Defendants from reducing the quarterly payment to any state by more than 25%. 42 U.S.C. § 609(d)(1). If this limitation results in unrecovered penalties, the balance is carried forward and assessed the following year. 42 U.S.C. § 609(d)(2).

105.    Defendants did not take any of the required procedural steps before freezing $7 billion in TANF funding to the Targeted States.

106.    The TANF letters do not acknowledge any of these statutory or regulatory obligations that Defendants must follow prior to imposing a penalty on a state's funds.

107.    The TANF letters cite an Office of Management and Budget regulation, 2 C.F.R. § 200.339, but that regulation does not supersede the processes and limits set forth by Congress in enacting TANF and, in any event, Defendants did not even attempt to comply with the procedural requirements of that regulation.

108.    TANF statutes and regulations prescribe a number of ways in which Defendants monitor compliance with program requirements, including potential fraud, and the manner in which data and records can be provided from states to Defendants in furtherance of its compliance efforts. For example, Congress has specified that each state must undergo regular audits; must report certain data to ACF regularly; and must conduct a quality control system covering determinations of eligibility, reviewed by ACF. *See* 42 U.S.C. §§ 611, 652; 45 C.F.R. pt. 265.

109.    Defendants likewise did not acknowledge any of these oversight mechanisms in implementing the Child Care Funding Freeze as to TANF. The TANF letter cites a regulation in support of its data demand, 45 C.F.R. § 98.90. But this regulation relates to CCDF, not TANF, and in any event provides specific procedural steps Defendants must take (and did not take here) to issue a finding of non-compliance for that program, as described above.

**C.    SSBG Procedures**

110.    Defendants may implement a penalty against a state for noncompliance in the SSBG program only following specific procedural steps. 42 U.S.C. § 1397e(b); 45 C.F.R. § 96.51.

111.    Defendants must first provide the state with notice of a finding for noncompliance. *Id.*

112.    Then, Defendants must provide the state with the opportunity for a hearing to contest this finding. *Id.*

113.    After the hearing, the state may appeal. 45 C.F.R. § 96.52.

114.    Upon a final decision, the sanction for the state is disallowance of funds in the amount found to be paid not in accordance with law or an offset of future payments in that same amount. 45 C.F.R. § 96.51(a), (b).

115.    Defendants can "withhold funds from a State *only if* the Department has provided the State an opportunity for a hearing." 45 C.F.R. § 96.51(c) (emphasis added).

116.    If Defendants receive a complaint that a state "has failed to use its allotment . . . in accordance with" law or regulations, it must "promptly furnish a copy of any complaint to the affected State." 45 C.F.R. § 96.50(c).

117.    The state then has a sixty-day period to submit comments in response to the complaint. *Id.* Defendants must then consider the state's comments. *Id.*

118.    In considering a complaint or the results of an audit, Defendants recognize that "the States are primarily responsible for interpreting the governing statutory provisions," and that is "consistent with the intent of and statutory authority for the block grant programs." As a result, Defendants "will defer to a State's interpretation of its assurances and of the provisions of the block grant statutes unless the interpretation is clearly erroneous." 45 C.F.R. § 96.50(e).

119.    Defendants did not take any of the required procedural steps before freezing $870 million in SSBG funding to the Targeted States.

120.    The SSBG letters do not acknowledge any of these statutory or regulatory obligations that Defendants must complete prior to penalizing a state's SSBG funding.

121.    SSBG statutes and regulations prescribe a number of ways in which Defendants monitor states' compliance with program requirements, including potential fraud, and the manner in which data and records can be provided from states to Defendants. For example, Congress has specified that each State must undergo regular audits and must report certain data to Defendants regularly. *See* 42 U.S.C. § 1397e; 45 C.F.R. § 96.74.

122.    Defendants likewise did not acknowledge any of these oversight mechanisms in implementing the Child Care Funding Freeze as to SSBG.

**VI.    Plaintiffs Have Been Harmed and Will Continue to be Harmed by the Funding Freeze**

123.    The Child Care Funding Freeze will irreparably harm Plaintiffs and their members.

**A.    Harm to AFSCME, AFSCME Affiliates, and Their Members**

124.    Plaintiff AFSCME's members interact with CCDF, TANF, and SSBG funds at various points along their distribution from the federal government to individual beneficiaries.

125.    First, AFSCME's membership includes employees of state and/or local governments, in all five affected states, whose work includes administering the affected funding and programs, some by making determinations for the government as to who is eligible for those programs and others whose work involves overseeing the execution of the funded programs. These state and local employees are members both of AFSCME and the AFSCME Affiliate that directly negotiates their collective bargaining agreements and represents employees in their day-to-day labor-management relations. Members pay dues to AFSCME as well as the AFSCME Affiliate. AFSCME's affected members who administer the benefits at issue in this case include (but are not limited to) members of the following AFSCME Affiliates.

a.      Plaintiff AFSCME Council 57 comprises 26 local unions representing 35,000 members throughout Northern California and the Central Valley. Among Council 57's members are county employees who administer the federal funding at issue in this case.

b.      AFSCME District Council 36 has 30,000 members across 74 local unions. Its members include county and city workers administering federally funded benefits, including CCDF, TANF, and SSBG, in Southern California.

c.      AFSCME Colorado represents thousands of workers across Colorado, including county employees who administer CCDF, TANF, and SSBG funds including by making eligibility determinations for who qualifies for those public benefit programs.

d.      Plaintiff AFSCME Council 31 represents employees throughout the state of Illinois, including both state and local government public employees. Among Council 31's members are state employees of the IDHS and ICDFS, which administer part of the federal CCDF, TANF, and SSBG money.

e.      AFSCME Council 5 ("Council 5") and AFSCME Council 65 ("Council 65") each represent public employees in Minnesota. Public benefit eligibility in Minnesota is administered at the county level. Council 5 and Council 65 each represent multiple bargaining units of county employees who determine eligibility for public benefits, including those at issue in this case.

f.      The Civil Service Employees Association, Local 1000 AFSCME, AFL-CIO ("CSEA"), is one of New York State's largest unions, comprising more than 250,000 workers delivering public services across the state. CSEA members include employees of counties throughout New York State who administer benefits funded by federal CCDF, TANF, and SSBG money, including by making eligibility determinations for those programs.

g.      District Council 37, AFSCME, AFL-CIO ("DC 37"), is the largest public employee union in New York City, with 150,000 members performing 1,000 different job titles. DC 37's members are organized into 16 different local unions that affiliate with DC 37, and thus with AFSCME as well. DC 37 represents city employees across city government, including those who

administer CCDF, TANF, and SSBG money by, for example, determining eligibility for those benefit programs.

126.    If the CCDF, TANF, and SSBG funding freeze takes effect, these state and local employees' jobs will be at risk as state and local governments scramble to adapt to the significant budgetary shortfall. The freeze is likely to result in layoffs of employees who administer these programs, causing AFSCME members to lose their jobs, as at least one of the affected states (Colorado) has already stated in sworn testimony. As a result, these members will lose important benefits like health insurance, which is provided by government employers. Layoffs would also harm AFSCME as an entity because they would mean the loss of those members' dues. Layoffs would also result in a loss of bargaining strength; it is well-understood that strength at the bargaining table is directly correlated to strength in numbers. That loss of strength will in turn harm those AFSCME members who are not laid off and whose working conditions are governed by AFSCME-negotiated collective bargaining agreements, as it will hamper AFSCME's ability to negotiate optimal terms and conditions for those remaining employees. The same is true even if layoffs do not occur, as reduced funding available to state and local governments from the federal government reduces those state and local governments' budgets for the wages and benefits AFSCME seeks to negotiate for its members in their CBAs.

127.    Second, AFSCME's membership includes child care providers who run their own independent businesses in New York and California and who provide care to families who pay with the affected federal subsidies.

128.    In California, Plaintiff UDW is a direct affiliate of AFSCME whose CBAs with the State of California covers more than 220,000 home care and child care providers across the state. UDW has as members approximately 8,000 independent child care providers in California.

129.    All UDW child care provider members are also members of Child Care Providers United ("CCPU"), which is a partnership between UDW/AFSCME and Plaintiff SEIU. CCPU has negotiated a collective bargaining agreement with the state of California that provides certain

1  guarantees to independent child care providers that enroll families on subsidies, including rates of

2  reimbursement and timely payment.

3      130.    When a family qualifies for subsidized child care under one of California's programs,

4  the state sends the family's subsidy to a third-party administrator, which then distributes the subsidy

5  to the provider to pay that family's child care tuition. In some areas, county government is the

6  intermediary; in other areas, a contractor serves this function.

7      131.    Every UDW child care member would be adversely affected by even temporary

8  withholding of federal money that funds California's child care subsidies because each member has

9  as a client at least one family that relies on the subsidy to pay the provider for their services. A majority

10  of UDW's approximately 8,000 child care provider members receive at least one-third of their

11  monthly tuition payment directly from child care subsidies. Many providers derive a much higher

12  percentage of their income from subsidies. If the federal funding at issue here is disrupted, California

13  would be unable to reimburse providers for the care they provide to qualifying low-income families.

14  Because child care providers operate on notoriously thin margins, the delay in even one family's

15  tuition payment could undermine the stability of a provider's business.

16      132.    Although, at the time this complaint is filed, the funding freeze challenged here is

17  subject to a temporary restraining order, the continued threat that the freeze will take effect is already

18  causing UDW member child care providers to alter their operations by forgoing needed investments

19  in their operations and taking other actions to pull back spending to prepare for a freeze.

20      133.    The federal government's demand for detailed information from the state in its funding

21  freeze letters will also impose burdens on UDW's child care members. The state already has extensive

22  processes in place to ensure program integrity and protect against fraud. The federal government's

23  demand for additional information on a short turnaround will increase scrutiny of UDW's child care

24  members, which harms them in two ways. First, it is likely to delay payments while data is reviewed

25  or aggregated. Child care providers are often small business owners who lack administrative staff.

26  Extra paperwork and administrative hurdles disproportionately affect them. Second, this targeting of

27  child care providers for more information will exacerbate the strain on providers already being

28

experienced as a result of the federal government's actions. Multiple UDW CCPU members have reported to UDW that they are being harassed at their worksites since the freeze was announced. This increased scrutiny will only exacerbate that harassment.

134.    Voice of Organized Independent Child Care Educators ("CSEA/VOICE") Local 100A, is an affiliate of both CSEA and AFSCME that currently represents over 10,000 child care providers in New York State who serve families who rely on tuition subsidies funded by the federal money at issue in this case. Many of CSEA/VOICE's members derive a significant majority of their income from families who pay by subsidy.

135.    CSEA/VOICE has negotiated a collective bargaining agreement with the State of New York's Office of Children and Family Services. That agreement, among other things, sets forth the parties' commitment to work together to seek federal funding to expand the state's child care program. It also establishes benefits to CSEA/VOICE members, like a state commitment to contribute to the union's health insurance fund, the establishment of a professional development committee, and a payment dispute resolution procedure.

136.    New York's child care subsidy program is called the New York State Child Care Assistance Program (CCAP). It is overseen by the state and administered on the local level. Generally, child care providers have contracts directly with local entities that reimburse the provider for a qualifying family's tuition.

137.    CSEA/VOICE members have families on subsidies in their care and would be adversely affected by a funding freeze. If the federal funding at issue here is disrupted, New York would be unable to reimburse providers for the care they provide to qualifying low-income families. Moreover, CSEA/VOICE members, like most child care providers, operate on razor thin margins, meaning that any delay in reimbursement would quickly force providers to make dramatic and devastating changes, including freezing hiring, delaying wage increases, postponing purchases of classroom materials, holding off on signing leases or making repairs, and limiting enrollment.

138.    Although, at the time this complaint is filed, the funding freeze challenged here is subject to a temporary restraining order, the continued threat that the freeze will take effect is already

causing CSEA/VOICE member child care providers to alter their operations by forgoing needed investments in their operations and taking other actions to pull back spending to prepare for a freeze. If any AFSCME independent child care provider member is forced to close their business, AFSCME as an entity will be harmed by that closure as well. That member will no longer pay dues to AFSCME and will no longer contribute to AFSCME's strength in numbers, thereby weakening AFSCME's influence at the bargaining table.  These AFSCME members will also lose the opportunity to perform the mission-driven work of caring for the children of their communities, a public service which they love and to which they have dedicated their lives.

139.    AFSCME and AFSCME Affiliates also represent employees who perform child care work at employers funded by the subsidies at issue in this case, and those employees, too, would be harmed if the funding freeze were to take effect.  For example, Plaintiff AFSCME Council 31 represents employees of the Champaign County Regional Planning Commission ("CCRPC") in its Early Childhood Education Program pursuant to a CBA currently in effect through February 28, 2026. CCRPC's Early Childhood Education Program is funded in part by Illinois CCAP. CCRPC has already informed AFSCME Council 31 that it will have to lay off staff and reduce capacity if the freeze takes effect. AFSCME Council 31 members will therefore lose their jobs, along with important benefits like health insurance. Their terminations would in turn weaken AFSCME Council 31 by depriving it of dues-paying members who not only contribute financially, but whose membership constitutes the union's strength and influence. What is more, AFSCME Council 31 is currently in bargaining with CCRPC for a new collective bargaining agreement. A funding shortage resulting from the freeze will weaken AFSCME's ability to secure optimal terms and conditions for its members.

140.    Finally, AFSCME has members who themselves, as parents and caregivers, rely on government benefits funded by the federal funds at issue. AFSCME has identified some of these members specifically, and they would risk having to cut back hours or quit their jobs entirely if they were to lose access to these child care subsidies. That would gravely harm these AFSCME members individually, turning their lives and their families' lives upside down, and robbing their communities of high-quality public servants. It would also harm AFSCME's other members and AFSCME as an

organization by removing those individuals from dues-paying AFSCME membership (which is based on employment in an AFSCMEC-represented bargaining unit of employees).

**B.    Harms to SEIU and Its Members**

141.    Although there is variation in the names of agencies and programs through which States deploy the federal funds at issue, one constant remains: hundreds of thousands of families depend on these federal programs for child care and other essential services, and any funding freeze will irreparably harm SEIU members at multiple points along the program delivery continuum.

142.    SEIU members include state and local employees in the Targeted States who administer and process applications for programs funded by CCDF, TANF, and SSBG; monitor the quality of child care facilities; conduct background checks on child care providers; implement child care licensing programs; ensure compliance with state and federal requirements; and investigate fraud. SEIU affiliate Colorado WINS, for example, represents 280 employees at the Colorado Department of Early Childhood ("CDEC"), the state agency responsible for supporting, coordinating, and improving early learning, care, and family services for young children and their families. Of these employees, 120 are funded through CCDF. If CCDF funds to Colorado are frozen, there will be layoffs at the CDEC. These layoffs will have a ripple effect: terminated workers will lose their livelihoods and collectively-bargained benefits; remaining workers will contend with increased workloads; and, if the workforce is substantially depleted, the agency will likely narrow its programmatic focus, which, in turn, could result in violations going uninvestigated, child care centers and providers facing longer wait times for new licenses and license renewals, and counties stripped of the support they need from the State. The loss of such a substantial amount of federal funding will also undoubtedly create budget shortfalls, which add further precarity to the status of SEIU members in other public sector bargaining units.

143.    SEIU also represents nearly 70,000 family child care workers in the Targeted States, including both licensed providers and licensed-exempt Family, Friend, and Neighbor providers. Family child care workers are early educators who provide high-quality, educational, and culturally- and linguistically-resonant child care in their homes. SEIU members in this industry often operate

their child care programs from early in the morning until late into the evening to accommodate parents' varying work schedules. They operate on razor-thin margins, which have narrowed even further since the COVID-19 pandemic due to inflation and rising costs. Child care providers also frequently pay out-of-pocket for items that children need but that exceed their reimbursement amounts, like snacks for hungry children, construction paper and resources to keep active older children engaged during after-school hours, and even clothing and shoes for children. Many members of SEIU affiliates SEIU Healthcare Illinois Indiana ("HCII"), SEIU Local 99/CCPU, and SEIU Local 521/CCPU provide child care services in low-income communities, which means that a significant proportion, if not all, of the parents they serve rely on child care subsidies.

144.    If federal funds are frozen, the harm would be truly irreparable. These providers do not have access to other grants or bank loans that would help them withstand even a short suspension of payments. As a result, child care programs would shut down, providers and their staff would lose their jobs, children would be deprived of early learning and developmental opportunities, and parents and caregivers who rely on quality, accessible, affordable child care would be stripped of a crucial lifeline. Indeed, many private-paying parents and caregivers would likewise be harmed because their local child care providers would close due to the loss of enrollment of the children of parents and caregivers with child care subsidies. The harm to child care providers is exacerbated by the fact that they first provide the services and resources to care and educate children and are then reimbursed for already-paid expenses. If the Child Care Funding Freeze goes into effect, an already-precarious system collapses at many levels and it will take decades to recover.

145.    SEIU also represents over 15,000 child care and preschool workers who work in various settings—child care centers, Head Start agencies, public schools, and local government programs. In California and Illinois, specifically, SEIU represents thousands of workers at private day care centers and early learning programs in public school districts that are funded through CCDF. They ensure children ages 0-5 develop the physical, cognitive, linguistic, and social-emotional skills necessary to thrive in K-12 education, in addition to nutritious meals. Parents and caregivers can use child care subsidies to enroll their children in these centers and programs, as well. Like family child

care providers, these centers and programs also operate on thin margins and would be impacted in the same ways, as would the communities they serve. When funding for Head Start programs was disrupted, many sites closed. Some re-opened but others did not. If the Child Care Funding Freeze is not halted, there will be a snowball effect of closures, children and families without access to essential care, and parents and caregivers whose jobs and educational opportunities will be significantly upended.

146.    SEIU members also include working parents and caregivers who rely on federally-funded child care subsidies to care for the children in their families. If federal funds are frozen, these members face dire situations: the shuttering of trusted child care provider programs; the disruption of their children's social and educational development; and the upheaval of their own work or educational opportunities. If parents and caregivers leave the workforce, there will be cascading economic effects for local communities. If nursing home workers and home care workers cannot go to work, elderly people and individuals with disabilities will suffer. If health care workers cannot go to work, patient care delivery will be jeopardized. If retail workers and fast food workers cannot go to work, local economies will be negatively impacted.

### C.    Harms to Main Street Alliance and Its Members

147.    Plaintiff MSA represents numerous small businesses that provide child care and early childhood education services and that would be grievously injured by the Child Care Funding Freeze.

148.    Many of these members serve communities and individual families that rely on financial assistance through the three affected programs and could not otherwise afford to enroll their children. One member in Illinois, for example, runs an early childhood education center at which roughly 85% of the families receive assistance through funds from CCDF and TANF.

149.    The consequences of the Child Care Funding Freeze would be immediate and irreparable even for members who enroll fewer children receiving subsidies. Because so many child care providers operate on such slim margins, the abrupt freeze of this money, even for a relatively short period of time, would cause providers to immediately begin taking steps such as laying off staff, curtailing hours and services, or refusing to enroll children whose families do not have the means to

pay regular tuition. Many providers would be no more than weeks away from having to close their doors entirely.

150. The harm to the children and families these members serve would be severe. Children facing risk factors including food insecurity, homelessness, and domestic violence would be deprived of a vital source of care, stability, and sustenance. Their progress in learning, social development, and treatment for things like speech or behavioral issues would be set back, with long-term consequences. Many parents already in difficult financial circumstances would be forced to stop working, with cascading effects for themselves and their families. Even if and when funding for these programs resumes, parents may then no longer meet the work requirements necessary to qualify to receive assistance. Families would not necessarily be able to simply resume their previous child-care arrangements, including with Plaintiffs' members.

### **CLAIMS FOR RELIEF**

#### **Claim I:**
#### **Violation of the Administrative Procedure Act – 5 U.S.C. § 706(2)(A), (C)**
**Against All Defendants**
**(Action Not in Accordance With Law and Exceeding Statutory Authority)**

151. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

152. Under the APA, a court shall "hold unlawful and set aside agency action … found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

153. "An agency . . . literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (quotation marks omitted).

154. The Child Care Funding Freeze is final agency action. 5 U.S.C. §704.

155. The freeze is contrary to provisions in the authorizing statutes and implementing regulations for CCDF, TANF, and SSBG, which, as detailed above, require payment of relevant funding and restrict Defendants' ability to withhold funding or otherwise sanction recipients.

156. The freeze is not in accordance with law because it is contrary to these myriad provisions.

157.    The freeze is also in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, because no provision of the CCDF, TANF, and SSBG statutes authorizes Defendants to unilaterally and immediately withhold all funding under these programs.

158.    The Child Care Funding Freeze therefore violates the Administrative Procedure Act because it is inconsistent with law in violation of 5 U.S.C. § 706(2)(A) and exceeds statutory authority in violation of 5 U.S.C. § 706(2)(C).

### Claim II:
### Violation of the Administrative Procedure Act, 5 U.S.C § 706(2)(A)
### Against All Defendants
### (Arbitrary and Capricious Agency Action)

159.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

160.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be arbitrary [or] capricious."  5 U.S.C. § 706(2)(A).

161.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The APA requires that an agency provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).  An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem" before it. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 20 (2020) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

162.    The Child Care Funding Freeze is arbitrary and capricious in numerous respects. Several examples follow.

163.    First, the freeze's many conflicts with the authorizing statutes and implementing regulations for CCDF, TANF, and SSBG render it arbitrary and capricious.

164.    Second, Defendants failed to proffer a reasonable explanation for the freeze, including addressing the conflicts with the authorizing statutes and implementing regulations of the relevant programs.

165.    Third, Defendants failed to consider reasonable alternatives to their chosen approach, such as determining whether and to what extent fraud or other wrongdoing is occurring *before* taking steps to address such wrongdoing. *See Spirit Airlines, Inc. v. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) ("An agency is required to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives.").

166.    Fourth, Defendants failed to account for the substantial reliance interests of Plaintiffs' members and those they serve, their families, their employers, and countless others in continuing to receive assistance under the relevant programs and in receiving such assistance on a stable and predictable basis. Similarly, Defendants failed to account for and address the obvious chaos and harm—especially but not only affecting children, families, and caregivers—that their irrational funding freeze would cause.

167.    Fifth, Defendants acted arbitrarily and capriciously by targeting funding in California, Colorado, Illinois, Minnesota, and New York—and not in other states—based primarily on the actual or assumed exercise of protected First Amendment rights by funding recipients, other voters in those states, and their elected representatives.

168.    For these and other failings, the Child Care Funding Freeze is arbitrary and capricious under 5 U.S.C. § 706(2)(A).

**Claim III:**
**Violation of the First Amendment – Viewpoint Discrimination**
**Against All Defendants**

169.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

170.    "[P]olitical belief and association constitute the core of those activities protected by the First Amendment." *Elrod v. Burns*, 427 U.S. 347, 356 (1976); *see also O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 718 (1996) ("[P]atronage does not justify the coercion of a person's political beliefs and associations.").

171.    "[T]he government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression." *Rosenberger v. Rector & Visitors of*

1    *Univ. of Virginia*, 515 U.S. 819, 828 (1995). Such viewpoint discrimination "is presumed to be

2    unconstitutional." *Id.*

3    172.    The First Amendment applies to government action that is taken on the basis of a

4    person's actual *or assumed* political viewpoint. *See Heffernan v. City of Paterson, N.J.*, 578 U.S. 266,

5    273–74 (2016).

6    173.    In instituting the Child Care Funding Freeze, Defendants targeted funding in

7    California, Colorado, Illinois, Minnesota, and New York—and not in other states—based primarily

8    on the actual or assumed political views of the affected funding recipients, other voters in their states,

9    and their elected representatives.

10    174.    Defendants' targeting of funding to Plaintiffs' members and others in the affected

11    states based on actual or assumed political expression violates the First Amendment' prohibition on

12    viewpoint discrimination.

13    175.    The Child Care Funding Freeze thus also violates the APA, 5 U.S.C. § 706(2)(B), as

14    contrary to constitutional right.

**Claim IV:**
**Violation of the First Amendment – Retaliation**
**Against All Defendants**

17    176.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

18    177.    "[T]he First Amendment prohibits government officials from subjecting individuals to

19    retaliatory actions after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v.

20    Wilson*, 595 U.S. 468, 474 (2022) (quotations omitted).

21    178.    To demonstrate unlawful First Amendment retaliation, a plaintiff must show that: "(1)

22    he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action

23    by the defendant that would chill a person of ordinary firmness from continuing to engage in the

24    protected activity; and (3) there was a substantial causal relationship between the constitutionally

25    protected activity and the adverse action." *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010)

26    (footnote omitted).

179.    In instituting the Child Care Funding Freeze, Defendants targeted funding in California, Colorado, Illinois, Minnesota, and New York—and not in other states—in retaliation for actual or assumed constitutionally protected activity by the affected funding recipients, other voters in their states, and their elected representatives.

180.    Defendants' targeting of funding to Plaintiffs' members and others in the affected states based on actual or assumed political expression violates the First Amendment's prohibition on retaliation.

181.    The Child Care Funding Freeze thus also violates the APA, 5 U.S.C. § 706(2)(B), as contrary to constitutional right.

**Claim V:**
**Violation of the First Amendment – Expressive Association**
**Against All Defendants**

182.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

183.    The First Amendment protects the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000).

184.    The government may not impose penalties based on the exercise of protected rights of association, including political association. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 72 (1990).

185.    In instituting the Child Care Funding Freeze, Defendants targeted funding in California, Colorado, Illinois, Minnesota, and New York—and not in other states—based on the affected funding recipients' actual or assumed exercise of their protected rights of association.

186.    Defendants' targeting of funding to Plaintiffs' members and others in the affected states based on actual or assumed association violates the First Amendment's protections for expressive association.

187.    The Child Care Funding Freeze thus also violates the APA, 5 U.S.C. § 706(2)(B), as contrary to constitutional right.

**Claim VI:**
**Violation of the Fifth Amendment – Equal Protection**
**Against All Defendants**

188.     Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

189.     The Fifth Amendment prohibits the federal government from denying equal protection of the laws. *See Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954).

190.     A plaintiff may bring a "class of one" equal protection claim where "[it] has been intentionally treated differently from others similarly situated and … there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also, e.g.*, *Gerhart v. Lake Cnty., Mont.*, 637 F.3d 1013, 1021-23 (9th Cir. 2011).

191.     "[A] bare . . . desire to harm a politically unpopular group" is "not [a] legitimate state interest[]" that can satisfy equal protection analysis. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985); *see also Perkins Coie LLP v. Dep't of Just.*, 783 F. Supp. 3d 105, 168 (D.D.C. 2025) ("Under the . . . guarantee of equal protection under the law, . . . settling personal vendettas by targeting a disliked business or individual for punitive government action is not a legitimate use of the powers of the U.S. government . . . .").

192.     In instituting the funding freeze, Defendants intentionally treated funding recipients in California, Colorado, Illinois, Minnesota, and New York differently from similarly situated recipients in other states.

193.     Defendants' reasons for that differential treatment are arbitrary and irrational. Defendants lack any rational, legitimate, or compelling governmental interest in treating recipients in the targeted states differently from similarly situated entities in other states.

194.     Defendants' differential treatment is motivated by animus towards the actual or assumed political views of Plaintiffs' members and other funding recipients in the Targeted States, as well as other voters in those states and their elected representatives.

195.     Through these actions, Defendants have violated the Equal Protection guarantee of the Fifth Amendment.

196.    The Child Care Funding Freeze thus also violates the APA, 5 U.S.C. § 706(2)(B), as contrary to constitutional right.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray that this Court:

1.    Issue a judicial declaration that the Child Care Funding Freeze is in excess of statutory authority, contrary to law, and arbitrary and capricious, in violation of the Administrative Procedure Act and is unconstitutional;

2.    Stay the Child Care Funding Freeze and issue all other necessary and appropriate process to preserve status or rights pursuant to 5 U.S.C. § 705;

3.    Vacate the Child Care Funding Freeze and any and all actions taken pursuant to it under to 5 U.S.C. § 706;

4.    Preliminarily and permanently enjoin Defendants from implementing the Child Care Funding Freeze, including enjoining Defendants from enforcing, implementing, or maintaining the January 5 and 6 Letters in their entirety;

5.    Enjoin Defendants from effectuating any similar policy under a different name;

6.    Award Plaintiffs their costs, reasonable attorneys' fees, and other disbursements as appropriate; and

7.    Grant such other relief as this Court may deem proper.

Date: January 23, 2026                          Respectfully submitted,

/s/ Lorrie E. Bradley
Lorrie E. Bradley (SBN 309411)
Peter M. McEntee (SBN 252075)
**BEESON, TAYER & BODINE**
492 Ninth Street, Suite 350
Oakland, CA 94607
lbradley@beesontayer.com
pmcentee@beesontayer.com

***Counsel for Plaintiffs***

/s/ Yenisey Rodríguez
Yenisey Rodríguez (DC Bar No. 1600574)*
Kevin E. Friedl (DC Bar No. 90033814)*
Cortney Robinson Henderson (DC Bar
  No. 1656074)*
Shiva Kooragayala (IL Bar No. 6336195)*
Joel McElvain (DC Bar No. 448431)*
Robin F. Thurston (DC Bar No. 1531399)*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 297-4810
yrodriguez@democracyforward.org

kfriedl@democracyforward.org
crhenderson@democracyforward.org
skooragayala@democracyforward.org
jmcelvain@democracyforwward.org
rthurston@democracyforward.org

***Counsel for Plaintiffs***

/s/ *Teague Paterson*
Teague Paterson (SBN 226659)
Matthew Blumin (DC Bar No. 1007008)*
Georgina Yeomans (DC Bar No. 1510777)*
**AMERICAN FEDERATION OF STATE,**
**COUNTY, AND MUNICIPAL**
**EMPLOYEES, AFL-CIO (AFSCME)**
1625 L Street NW
Washington, DC 20036
(202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org
GYeomans@afscme.org

***Counsel for Plaintiff AFSCME***


*Motion to appear *pro hac vice* forthcoming

/s/ *Steven K. Ury*
Steven K. Ury (SBN 199499)
**SERVICE EMPLOYEES**
**INTERNATIONAL UNION, AFL-CIO**
1800 Massachusetts Avenue NW
Washington, DC 20036
(202) 730-7424
steven.ury@seiu.org

***Counsel for Plaintiff SEIU***