Lorrie E. Bradley (SBN 309411)
Peter M. McEntee (SBN 252075)
**BEESON, TAYER & BODINE**
492 Ninth Street, Suite 350
Oakland, CA 94607
(510) 625-9700
lbradley@beesontayer.com
pmcentee@beesontayer.com

*Counsel for Plaintiffs*

[Additional co-counsel on signature page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL-CIO, et al., | Case No. 3:26-cv-00759-TLT |
| *Plaintiffs*, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR STAY UNDER 5 U.S.C. § 705 AND PRELIMINARY INJUNCTION** |
| v. | |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | Judge:  Hon. Trina L. Thompson<br>Ctrm:   9 – 19th Floor<br>Date:<br>Time: |
| *Defendants*. | |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

STATEMENT OF ISSUES TO BE DECIDED ........................................................................ 2

FACTUAL BACKGROUND .................................................................................................. 3

    I.    Under the Pretext of Concerns Over Fraud, HHS Unlawfully Leverages Federal Funds to Target Residents Living in Democrat-Led Jurisdictions ............... 3

        Escalating Threats Against Targeted Jurisdictions and their Residents ................... 3

        Administration Begins Pretextual Messaging About "Fraud" in the Targeted States ..................................................................................................................... 5

        Defendants Summarily Freeze $10 Billion in Federal Funding for Targeted States and their Downstream Recipients ................................................................. 6

    II.    Defendants Blatantly Disregard the Governing Statutory and Regulatory Scheme in Freezing $10 Billion in Federal Funding to Targeted States .................. 7

        CCDF Program Assistance Fund ............................................................................ 8

        TANF Program Assistance Fund .......................................................................... 11

        The SSBG program assistance fund ..................................................................... 13

        HHS also unlawfully conditions future fund disbursements on far-reaching demands ................................................................................................................. 15

    III.    A Loss of Federal Funding Would Wreak Catastrophic and Irreparable Harms on Plaintiffs' Members ............................................................................... 16

LEGAL STANDARD ......................................................................................................... 17

ARGUMENT ..................................................................................................................... 18

    I.    Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims .................... 18

        A.    The Targeted States Funding Freeze is Final Agency Action ...................... 18

        B.    Defendants' Actions Are Contrary to Law and In Excess of Statutory Authority ..................................................................................................... 19

        C.    Defendants' Action Are Arbitrary and Capricious ....................................... 24

    II.    Plaintiffs and Their Members Will Continue to Suffer Increasingly Irreparable Harm Absent Prompt Relief ............................................................... 27

        A.    The Funding Freeze Will Cause Severe and Irreparable Harm to the Child and Family Care Providers, Including Union Plaintiffs' Members ..................................................................................................... 29

B.  Defendants' Actions will Impede the Ability for Parents, Including Plaintiffs' Members, to Access to Child Care .................................................. 31

C.  HHS's Funding Freeze Will Harm State and Local Government Employees, including Plaintiffs' Members................................................... 32

III.  The Balance of Equities and Public Interest Weigh in Favor of Plaintiffs .............. 33

CONCLUSION .................................................................................................................. 34

1

# TABLE OF AUTHORITIES

2

**CASES**

3

*All. for the Wild Rockies v. Pena*,

4
    865 F.3d 1211 (9th Cir. 2017) ....................................... 18

5

*Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*,

6
    926 F.3d 1061 (9th Cir. 2019) ....................................... 24

7

*Am. Acad. of Pediatrics v. HHS*,

    4505, No. 25-cv-, 2026 WL 80796 (D.D.C. Jan. 11, 2026)................................. 4

8

*Am. Ass'n of Univ. Professors v. Trump*,

9
    No. 3:25-cv-07864, 2025 WL 3187762 (N.D. Cal. Nov. 14, 2025) .......................... 23, 33

10

*Am. Bar Ass'n v. DOJ*,

11
    783 F. Supp. 3d 236 (D.D.C. 2025) ................................... 4

12

*Am. Fed'n of Gov't Employees v. Trump*,

    139 F.4th 1020 (9th Cir. 2025) ..................................... 19, 28

13

*Am. Fed'n of State Cnty. & Mun. Emps., AFL-CIO v. U.S. Off. of Mgmt. & Budget*,

14
    No. 25-CV-08302-SI, 2025 WL 3018250 (N.D. Cal. Oct. 28, 2025)........................ 25, 28

15

*Am. Libr. Ass'n v. Sonderling*,

16
    No. CV 25-1050, 2025 WL 1262054 (D.D.C. May 1, 2025) ......................... 28

17

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,

18
    750 F.2d 1470 (9th Cir. 1985) ..................................... 30

19

*Ariz. Dream Act Coal. v. Brewer*,

    757 F.3d 1053 (9th Cir. 2014) ..................................... 28

20

*Bennett v. Spear*,

21
    520 U.S. 154 (1997)................................................ 18, 18

22

*California v. Azar*,

23
    911 F.3d 558 (9th Cir. 2018) ...................................... 28

24

*City & Cnty. of San Francisco v. Trump*,

    783 F. Supp. 3d 1148 (N.D. Cal. 2025) ............................. 19

25

*City & County of San Francisco v. Trump*,

26
    897 F.3d 1225 (9th Cir. 2018) .................................... 22

27

28

Pls.' Mem. ISO Mot. for Stay Under
5 U.S.C. § 705 and Preliminary Injunction               Case No. 3:26-cv-00759

*City of Arlington, Tex. v. FCC,*
    569 U.S. 290 (2013) .................................................................................. 19

*City of Saint Paul v. Wright,*
    03899, No. 25-CV-, 2026 WL 88193 (D.D.C. Jan. 12, 2026) ......................... 25

*Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.,*
    780 F. Supp. 3d 897 (N.D. Cal. 2025) ...................................................... 28

*Comm. Legal Services in E. Palo Alto v. U.S. Dep't of Health & Human Servs.,*
    137 F.4th 932 (9th Cir. 2025) ................................................................. 22

*Ctr. for Food Safety v. Regan,*
    56 F.4th 648 (9th Cir. 2022) ................................................................. 19

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019) .......................................................................... 25, 26

*Dep't of Homeland Security v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020) ............................................................................ 25, 27

*Doran v. Salem Inn, Inc.,*
    422 U.S. 922 (1975) ............................................................................ 30

*E. Bay Sanctuary Covenant v. Biden,*
    993 F.3d 640 (9th Cir. 2021) ................................................................. 28

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ............................................................................ 25

*HiQ Labs, Inc. v. LinkedIn Corp.,*
    31 F.4th 1180 (9th Cir. 2022) ............................................................... 30

*Int'l Org. of Masters, Mates & Pilots v. NLRB,*
    61 F.4th 169 (D.C. Cir. 2023) ............................................................... 27

*La. Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986) ............................................................................ 19

*League of Women Voters of U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ................................................................. 34

*Level the Playing Field v. FEC,*
    961 F.3d 462 (D.C. Cir. 2020) ............................................................... 26

*Lincoln v. Vigil,*
    508 U.S. 182 (1993).................................................................................... 22

*Miller v. Carlson,*
    768 F. Supp. 1331 (N.D. Cal. 1991) ....................................................... 32

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)............................................................................. 25, 26

*Nat'l Fed'n of Indep. Bus. v. OSHA,*
    595 U.S. 117 .................................................................................... 19, 21

*Nat'l TPS All. v. Noem,*
    150 F.4th 1000 (9th Cir. 2025) ......................................................... 18, 20

*Nebraska v. Su,*
    121 F.4th 1 (9th Cir. 2024) ............................................................... 25, 26

*New York v. Noem,*
    8106, No. 25-cv-, 2025 WL 2939119 (S.D.N.Y. Oct. 16, 2025)................... 26

*New York v. Trump,*
    769 F. Supp. 3d 119 (D.R.I. 2025)............................................................. 22

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.,*
    465 F.3d 977 (9th Cir. 2006) .................................................................... 18

*Porwancher v. Nat'l Endowment for Humanities,*
    792 F. Supp. 3d 107 (D.D.C. 2025) ......................................................... 24

*R.I.L-R v. Johnson,*
    80 F. Supp. 3d 164 (D.D.C. 2015) ........................................................... 33

*Regents of Univ. of Cal.,*
    591 U.S. 22 .............................................................................................. 26

*Rodriguez v. Robbins,*
    715 F.3d 1127 (9th Cir. 2013) .................................................................. 33

*S.F. Herring Ass'n v. DOI,*
    946 F.3d 564 (9th Cir. 2019) .................................................................... 18

*Small v. Avanti Health Sys., LLC,*
    661 F.3d 1180 (9th Cir. 2011) .................................................................. 27

*Spirit Airlines, Inc. v. Dep't of Transp.*,
    997 F.3d 1247 (D.C. Cir. 2021) ........................................................... 26

*State of New York v. Administration for Children and Families*,
    1:26-cv-00172 (S.D.N.Y) ...................................................................... 6

*Thakur v. Trump*,
    795 F. Supp. 3d 1168 (N.D. Cal. 2025) ................................................. 24

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016) .............................................................................. 18

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) .............................................................. 28

*Washington v. U.S. Dep't of Transp.*,
    792 F. Supp. 3d 1187 ..................................................................... 22, 24

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................... 17, 27

*Wolford v. Lopez*,
    116 F.4th 959 (9th Cir. 2024) .............................................................. 33

**FEDERAL STATUTES**

5 U.S.C.
    §552a(e) ................................................................................................ 23
    § 705 ................................................................................ 1, 2, 18, 19, 20
    § 706 .................................................................................................... 19
    § 706(2)(A) .......................................................................................... 24

42 U.S.C.
    §602(a) ........................................................................................... 12, 25
    § 603(a)(1) ........................................................................................... 11
    §603(a)(1)(B) ....................................................................................... 22
    § 603(a)(1)(C) ...................................................................................... 11
    §609(a) ................................................................................................. 12
    § 609(a)(1) ........................................................................................... 21
    §609(a)(1)(A) .......................................................................... 13, 16, 20
    §609(a)(1)(B) .................................................................................. 13, 17
    § 609(a)(2) ........................................................................................... 21
    §609(c)(1)(A) ........................................................................... 12, 13, 20
    §609(c)(1)(D) ....................................................................................... 13
    §609(c)(2) ............................................................................................ 13

§609(c)(3) ...........................................................................................13
§ 609(d) ...............................................................................................21
§609(d)(1) ......................................................................................13,16
§609(d)(2) ..........................................................................................13
§610(a) ..........................................................................................13, 20
§610(b)(1) ...........................................................................................13
§ 611 ...........................................................................................16, 22, 27
§611(a)(1)(B)(i) ...................................................................................23
§ 617 ...............................................................................................12, 21
§ 618 .....................................................................................................22
§618(a)(1) .............................................................................................9
§ 652 ...........................................................................................16, 22, 27
§ 985 .............................................................................9, 10, 22, 23, 26
§ 1397 ...................................................................................................14

§ 1397a ..............................................................................................14
§ 1397a(a)(1) ..................................................................................16, 21
§1397b(b) .......................................................................................14, 22
§1397e .....................................................................................14, 16, 22, 27
§1397e(b) ..............................................................................14, 16, 20, 21
§ 9858(h) .........................................................................................9, 22
§ 9858(i) ..............................................................................................15
§ 9858(m) .......................................................................................9, 22
§ 9858c ............................................................................................9, 25
§9858g(b)(2)(A) ...............................................................................20,21
§9858g(b)(2)(A)(ii) ..........................................................................16, 21
§9858g(b)(2)(B) ...............................................................................20, 21
§ 9858i ...........................................................................................22, 27

44 U.S.C.
§3507(a)(1)(D) ....................................................................................23
§3553(a)(2) ...........................................................................................23

Computer Matching and Privacy Protection Act of 1988
Pub. L. No. 100-503, § 2, 101 Stat. 2507 ............................................ 23

Pub. L. No. 118-42, 138 Stat. 418 (2024) ................................................ 11

Pub. L. No. 118-47, 138 Stat. 665 (2024) ................................................ 14

Pub. L. No. 118-83, 138 Stat. 1533 (2024) .............................................. 14

TANF in the Continuing Appropriations and Extensions Act.
Pub. L. No. 119-37, 139 Stat. 497 (2025) ............................................ 11, 14

Fed. R. Civ. P.

Rule 65 ...................................................................................................... 17

**FEDERAL REGULATIONS**

2 C.F.R.

§ 200.101(a)(2) ....................................................................................... 23
§ 200.101(d) ........................................................................................... 23
§ 200.106 ................................................................................................ 23
§200.208(c) ............................................................................................24
§ 200.339 ..................................................................................... 13, 23, 24
§ 200.342 ................................................................................................ 24

45 C.F.R.

§96.50(c) ...........................................................................................14, 20
§96.50(e) ................................................................................................15
§ 96.51 ..............................................................................................14, 15
§96.51(a) ................................................................................................15
§96.51(c) ................................................................................................15
§ 96.52 ....................................................................................................15
§ 96.74 ..............................................................................................14, 16
§ 98.65 ..............................................................................................15, 27
§ 98.65(d) ............................................................................................... 10
§ 98.66(a) ............................................................................................... 10
§ 98.66(b) ............................................................................................... 10
§ 98.66(c) ............................................................................................... 10
§ 98.66(i) ................................................................................................ 10
§98.67(a) ................................................................................................23
§98.67(c) ................................................................................................23
§98.67(c)(2) ...........................................................................................11
§ 98.90 ..............................................................................................16, 23
§98.90(b) ..........................................................................................10, 20
§ 98.92(b) ............................................................................................... 10
§98.93(a) ................................................................................................10
§98.93(c) ..........................................................................................10, 20
§262.4(a) ..........................................................................................12, 20
§262.7(a)(2) ...........................................................................................13
§ 263.10...................................................................................................12
§ 265 .................................................................................................16, 25

1

**INTRODUCTION**

2    The Trump-Vance Administration is engaged in a campaign of retribution against those whom

3    it perceives to be its political enemies. The latest front in that campaign is the administration's effort

4    to punish the residents of California and four other states for voting for members of the Democratic

5    Party to lead their respective states. The punishment that the administration has chosen to inflict on

6    these states comes in the form of the U.S. Department of Health and Human Services' ("HHS")

7    announcement on January 6, 2026, of an immediate, and indefinite, freeze of $10 billion in federal

8    child care and family assistance grants across the "blue" states of California, Colorado, Illinois,

9    Minnesota, and New York (the "Targeted States"), and no others. Exs. 1, 13 at 5.[1] The grant programs,

10    which Congress appropriated to support the child care and social service needs of low-income

11    families, are comprised of three program funds: (1) nearly $2.4 billion in Child Care and Development

12    Fund ("CCDF"), (2) $7.35 billion in Temporary Assistance for Needy Families ("TANF"), and (3)

13    $869 million in Social Services Block Grant ("SSBG") funding (collectively, "Child Care and Family

14    Assistance Grants"). Although HHS claimed it had imposed the freeze out of concerns that benefits

15    had been provided to ineligible persons, it provided no evidence for this assertion. *Id.*

16    HHS's imposition of this freeze will cause immense harm to residents of the Targeted States,

17    including Plaintiffs and their members, who comprise labor organizations and a small

18    business membership organization that collectively represent child care providers, state and local

19    government employees who administer the Child Care and Family Assistance Grants, and parents

20    and caregivers who receive these subsidies. If HHS's funding freeze takes effect, Plaintiffs' members

21    will be directly harmed in a multitude of ways: "child care providers will shutter, workers who play

22    varied roles in the administration of these programs will lose their jobs, both private-paying parents

23    and subsidized-recipient parents will lose the support they need to work or pursue education and

24    training, and children will lose the social, educational, and developmental opportunities they need to

25    thrive and prepare for lifelong learning success." Ex. L, Declaration of Gabriel Peterson (SEIU) ¶ 13;

26

27

28

---

[1] All "Ex." citations refer to exhibits attached to the accompanying Declaration of Nyaruach Chuol.

1    *see generally* Ex. E, Declaration of Michelle Sforza (AFSCME) (documenting similar harms to

2    Plaintiff AFSCME's members); Ex. P, Declaration of Shawn Phetteplace (MSA) ¶¶ 5,7, 9 (same).

3         The Administrative Procedure Act ("APA") does not permit HHS's action. Even if HHS

4    believed there were such widespread, ongoing fraud (a baseless claim), it has no statutory or

5    regulatory authority to impose a unilateral freeze. To the contrary, congressional direction and

6    implementing regulations forbid it from unilaterally deciding to halt subsidies under these programs.

7    HHS cannot circumvent these directives by withholding all funding to the Targeted States and their

8    residents until those states comply with impossible demands for voluminous information. HHS also

9    acted arbitrarily by imposing the freeze without even considering the procedures that it was obligated

10   to follow, whether any alternative could address the agency's concerns, or the weighty reliance

11   interests at stake, among other things.

12        The Court should grant a stay pursuant to 5 U.S.C. § 705 and a preliminary injunction to

13   prevent HHS from unilaterally withholding federal funding needed to provide child care and other

14   social services for millions of residents of the Targeted States, including Plaintiffs' members. Without

15   this relief, Plaintiffs' members—many of whom are either child care providers who cannot provide

16   essential care without these critical funds or other state and local government employees whose

17   essential services rely on this funding—would be irreparably harmed. Child care centers would need

18   to shutter their operations (and indeed are already altering their operations by, for example, decreasing

19   class sizes and forgoing essential hires); families would lose child and other home care services

20   overnight; and other essential public servants would lose their jobs (and are already being

21   disadvantaged now in negotiating wages and benefits with public employers due to the freeze). The

22   balance of the equities also favors this relief, as the defendants will suffer no meaningful harm from

23   HHS continuing to disburse the funds as it is legally required to do, and the public can only benefit

24   from an orderly and lawful process to use funds for which they qualify.

25                                  **STATEMENT OF ISSUES TO BE DECIDED**

26        The issues to be decided in this Motion are:

27

28   Pls.' Mem. ISO Mot. for Stay Under
     5 U.S.C. § 705 and Preliminary Injunction

1.  Whether Plaintiffs are likely to succeed on their claims that HHS violated the APA when it froze CCDF, TANF, and SSBG funds in the Targeted States because the freeze (a) is not in accordance with the law, and in excess of statutory authority, and (b) is arbitrary and capricious.

2.  Whether Plaintiffs will experience irreparable harm absent an injunction during the pendency of this litigation.

3.  Whether the balance of the equities and public interest support a preliminary injunction.

**FACTUAL BACKGROUND**

**I.    Under the Pretext of Concerns Over Fraud, HHS Unlawfully Leverages Federal Funds to Target Residents Living in Democrat-Led Jurisdictions**

**A. Administration's Escalating Threats Against Targeted Jurisdictions and their Residents**

The Trump-Vance Administration has turned a campaign pledge to punish political opponents into a guiding principle of governance. What began as a provocative rallying cry in March 2023—"I am your retribution," Ex. 2—has hardened into a sweeping policy of retaliation against perceived enemies, often through the unlawful reshaping of federal funding. According to a Reuters "retribution tracker," the Administration targets perceived enemies "with threats of investigations or penalties, including freezing federal funds for Democratic-led cities such as New York and Chicago," Ex. 3.

Even before taking office, President Trump threatened to withhold federal funding from disfavored states and elected officials, saying of California Governor Newsom, for example, that if he did not "take care of [the state's] water situation," "we'll force it down his throat." Ex. 4. "And we'll say: Gavin, if you don't do it, we're not giving you any of that fire money that we send you all the time for all the fire, forest fires that you have." *Id.* The administration's threats are not idle nor conjectural. In fact, over the past year, Trump and his officials have repeatedly admitted to terminating federal grants in retribution because the recipients were located in "blue states," Exs. 5, 6,[2] including in litigation, Ex. 7, with a district court characterizing the administration's fund

---

[2] Ex. 5 (Donald J. Trump declaring that "[i]f communist Candidate Zohran Mamdani wins the

1  terminations as "a coercive threat," "primarily – if not exclusively – based on whether the awardee

2  resided in a state whose citizens voted for President Trump in 2024." Ex. 6. The administration has

3  previously singled out funding in New York and Illinois as well, for example, freezing $18 billion in

4  infrastructure money for New York, Ex. 8, and billions more for projects in Chicago. Exs. 8, 9. The

5  administration has likewise sought to choke off numerous sources of federal funding to recipients in

6  Colorado, following a dispute with Governor Jared Polis over President Trump's attempts to pardon

7  his supporter and former Mesa County Clerk Tina Peters. Among other retaliatory cuts, the

8  administration announced plans to shutter a major climate research center in the state, Ex. 10, and

9  President Trump vetoed funding for a clean-water pipeline he had once supported, Ex. 11. Even the

10 administration's political allies have acknowledged it is acting out of "political retaliation." Ex. 12.

11     Within weeks of the funding freeze HHS ordered here, the administration ordered a "sweeping

12 review" by multiple agencies of essentially all federal funding sent to over a dozen Democratic-run

13 states,[3] including all five of the Targeted States, but not any Republican-led states. Ex. 13. The Center

14 for Budget and Policy Priorities noted this "sweeping investigation of almost all federal funding to

15 14 states … suggests funding freezes may be coming." Ex. 14; *see also* Ex. 13 (noting "Virginia,

16 wasn't listed in the original memo, but" after inaugurating a Democratic governor on January 17, "has

17 since been included" to the sweeping funding probe).

18

19

20 _____

Election for Mayor of New York City, it is unlikely I will be contributing Federal Funds, other than

21 the very minimum a required … because of the fact that, as a Communist, this once great City has
   ZERO chance of success, or even survival! It can only get worse with a Communist at the helm, and

22 I don't want to send, as President, good money after bad."); Ex. 6 (announcing Trump's plan for
   "[s]tarting February 1, we are not making any payments to sanctuary cities or states having

23 sanctuary cities …); https://www.theguardian.com/us-news/2026/jan/14/trump-sanctuary-cities-
   funding; *see also Am. Acad. of Pediatrics v. HHS*, No. 25-cv-4505, 2026 WL 80796, at *21 (D.D.C.

24 Jan. 11, 2026) (finding that defendant HHS had likely terminated plaintiff's grants in retaliation for

25 plaintiff's protected First Amendment activities critical of the administration); *Am. Bar Ass'n v.
   DOJ*, 783 F.Supp.3d 236, 246 (D.D.C. 2025) (stating "[t]he ABA has made a strong showing that

26 [d]efendants terminated its grants to retaliate against it for engaging in protected speech.").
   [3] California, Colorado, Connecticut, Delaware, Illinois, Massachusetts, Minnesota, New Jersey, New

27 York, Oregon, Rhode Island, Vermont, Washington state, and Washington, D.C.

28 Pls.' Mem. ISO Mot. for Stay Under
   5 U.S.C. § 705 and Preliminary Injunction                              Case No. 3:26-cv-00759

**B. Administration Begins Pretextual Messaging About "Fraud" in Targeting Federal Funds Dedicated to Residents Living in "Blue States"**

Consistent with the pattern of targeting Democratic-led states, Defendants began to use pretextual, vague, and unsubstantiated allegations of "fraud" to target funding to low-income residents living in Democratic-led states. Beginning in December 2025, HHS started to request enormous amounts of data from Minnesota regarding CCDF, TANF, and SSBG program funds. While ACF's requests demanded "the complete universe" of "administrative data" on CCDF, TANF, and SSBG, it never cited to a single specific report, investigation or instance of fraud. Exs. 15, 16, 17. Rather, HHS claims the requests were triggered by "[r]ecent reports indicating extensive and system fraud within Minnesota social services programs that rely on federal funding." *Id.* On December 12, 2025, HHS directed Minnesota to produce the "complete universe" of "administrative data that exist and are in the state's possession for all recipients for all available years, and at least 2022 to 2025." Ex. 17. Minnesota was directed to comply with this request for CCDF, Ex. 17, and SSBG within 14 days (December 26 deadline), Ex. 18, and within 10 days for data related to TANF (January 9 deadline). Ex. 19.

The day after Christmas, a 23-year-old self-described "independent journalist," posted a video purporting to show that various Minneapolis day cares were not providing services to children despite receiving federal funding. Ex. 20 (stating that, "[b]y 2025, [Nick] Shirley was well-known in the MAGA universe and was invited to speak at the White House in October during a roundtable with President Donald Trump about Antifa …". The next day, Vice President Vance reposted Shirley's video, writing, "[t]his dude has done far more useful journalism than any of the winners of the 2024 Pulitzer Prize," Ex. 21, while a White House spokesperson stated that "the country should be deeply appreciative to Shirley for shining a light on this issue." Ex. 22. Within four days of Shirley's YouTube post, HHS Deputy Secretary Jim O'Neil announced that HHS was freezing all child care payments to Minnesota after he and "Alex Adams [] have identified the individuals in @nickshirleyy's excellent work." Ex. 23. According to O'Neil's post, HHS had "turned off the money spigot" before setting out to "find[] the fraud." *Id*. HHS has maintained the freeze even after

Minnesota's Department of Children, Youth, and Families "found the child care facilities at the center of recent fraud allegations were operating as they should." Ex. 24.

HHS did not "activate a defend the spend system for all ACF payments," for all states. Ex. 23. They instead engaged in a set of targeted attacks on critical funding that Congress had already appropriated to the residents living in five Democratic-led states. By January 6, 2026, HHS unilaterally extended the blanket freeze in letters issued to the remaining Targeted States—California, Colorado, Illinois, and New York—all Democratic-led jurisdictions. Some of the general boilerplate language from ACF's letters to Minnesota were copied and pasted into the freeze letters issued to the remaining Targeted States. Exs. 15, 16. 17, 19. While allegations of social services fraud in Minnesota have been the subject of federal investigations and media coverage for years, the State of Minnesota itself identified fraud during the Covid era, referred it to federal officials, and cooperated fully in the prosecution. The Trump-Vance administration is simply repackaging past allegations of fraud in Minnesota to misrepresent child care funding fraud as a "blue state" epidemic. Statements from officials, including Trump and HHS, during and after the freeze at issue here have made clear that levying "fraud" allegations against "blue states" is a politically driven stunt, one that is threatening social service supports for tens of thousands of children, low-income parents, educators, and small business owners living in the Targeted States. Exs. 25, 26, 27, 28, 29, 30.

## C. Defendants Summarily Freeze $10 Billion in Federal Funding for Targeted States and Residents (Downstream Recipients)

On January 6, 2026, HHS issued a press release freezing access to CCDF, TANF, and SSBG funds in "California, Colorado, Illinois, Minnesota, and New York" ("Targeted States Funding Freeze"). Ex. 1. Citing only general "concerns about widespread fraud and misuse of taxpayer dollars in state-administered programs," the HHS announcement "restrict[ed]" the access of Targeted States and downstream recipients to these critical funding streams for an indeterminate period of time.[4]

---

[4] Two days later, on January 8, 2026, Colorado, California, Illinois, New York, and Minnesota filed a complaint in *State of New York v. Administration for Children and Families*, 1:26-cv-00172 (S.D.N.Y), also challenging the Targeted States Funding Freeze. The plaintiff states filed a Motion

1    Consistent with the agency's press release, ACF sent letters, dated January 5 and 6, to the

2    governors of the Targeted States reiterating that CCDF, TANF, and SSBG program "[f]unds will

3    remain frozen in this fashion until ACF completes a review and determines that states are in

4    compliance with federal requirements." *See, e.g.,* Exs. 18 at 3; 19; 31. The letters do not specify any

5    federal requirements, and are largely identical, swapping out only the recipients and states' names.

6    Failing to mention any specific incidents of misconduct, these letters rest entirely on alleged

7    "concern" over "the *potential* for extensive and systemic fraud," which has "been heightened by

8    recent federal prosecutions and additional allegations that substantial portions of federal resources

9    were fraudulently diverted away from the American families they were intended to assist." Ex. 31 at

10    1. The letters claim that "ACF has reason to believe that" each state "is illicitly providing illegal aliens

11    with … benefits intended for American citizens and lawful permanent residents." *See, e.g.*, Ex. 31 at

12    1. None of the issued letters identify a single "prosecution" related to the frozen funds, adduce or

13    support any "allegations" of fraudulent diversion of funds, or cite any evidence or "reason to believe"

14    that any state is "illicitly providing illegal aliens" with those funds. These letters do not explain why

15    the Targeted States were singled out over others. When directly asked how the Targeted States had

16    been selected, HHS spokesperson Andrew Nixon provided no reasoned explanation nor cited any

17    evidence that would justify targeting those states, but simply said, "[t]hat's where our highest

18    suspicion is." Ex. 32.

19    **II.    Defendants Blatantly Disregard the Governing Statutory and Regulatory Scheme in
         Freezing $10 Billion in Federal Funding to Targeted States**

20

21    For each of the three assistance programs, Congress provided a detailed statutory and

22    regulatory scheme requiring ACF to follow specified procedures before imposing sanctions for

23    noncompliance with program requirements. Likewise, each program's governing laws and

24    regulations set forth what data ACF may collect and the manner in which they may collect it. The

25    _____
      for a Temporary Restraining Order ("TRO") along with their complaint to stay the Targeted States

26    Funding Freeze, which the court granted the next day for a period of 14 days. The court extended the
      TRO to remain in effect until February 6, 2026. The plaintiff states' motion for a preliminary

27    injunction, filed on January 15, 2026, is fully briefed and remains pending in that court.

28    Pls.' Mem. ISO Mot. for Stay Under
      5 U.S.C. § 705 and Preliminary Injunction

Case No. 3:26-cv-00759

1   governing scheme prioritizes stable and uninterrupted federal assistance for low-income families as

2   Congress did not provide HHS with any authority to suspend all funds to an entire state and its

3   residents, regardless of the basis. Quite the opposite. The only statutory or regulatory bases under

4   which HHS can reduce a state's funding first require ACF to make findings of noncompliance in a

5   state's administration of its programs, and such penalties can only be imposed in accordance with

6   robust statutory procedures set forth for each program.

7   **A. CCDF Program Assistance Fund**

8   **1. Background**

9   CCDF serves nearly 1.4 million low-income children and over 850,000 families monthly,

10  enabling parents to work, attend school, and engage in our national economy. Ex. 33. This fund

11  prioritizes services for children and families with very low incomes. Most families served have

12  incomes below the Federal Poverty Level, with a significant portion of families with incomes between

13  100 percent and 150 percent of the Federal Poverty Line. *Id*. This funding is intended to subsidize

14  child care expenses for qualifying families and to improve the overall quality and supply of child

15  care. CCDF also supports teacher training and development, as well as programming and consumer

16  education that educates parents about child care options. CCDF funding is distributed to state-

17  designated "lead agencies," which are sometimes counties and sometimes third-party distributors.

18  Those agencies in turn distribute the funding to subrecipients, including Plaintiffs' members.

19  Specifically, Plaintiffs' members include low-income parents who receive subsidized child care from

20  eligible providers; owners and operators of child care centers that are reimbursed by the state-

21  designated agencies with CCDF funds for care they provide for their students; and full-time

22  employees of child care centers whose operations are funded by CCDF funds as well. *See, e.g.*, Sforza

23  Dec. (AFSCME) ¶¶ 5 (summarizing harms to AFSCME's members), 11, 33-35, 48, (harms to

24  members who receive subsidies); 15-22, 40-47 (harms to members who own operate childcare

25  centers); 32-33, 50 (harms to full-time employees of centers receiving subsidies), 12-13, 25-28, 38,

26  49 (harms to local and state administrators of grant programs); *see also* Peterson Dec. (SEIU) ¶¶ 19

27  (harms to child care providers), 20 (harms to local and state administrators of the grant programs),

28  Pls.' Mem. ISO Mot. for Stay Under
    5 U.S.C. § 705 and Preliminary Injunction

Case No. 3:26-cv-00759

1   23-24; Phetteplace Dec. (MSA) ¶¶ 5–9 (harms to child care providers as small business owners); Ex.

2   A., Declaration of Courtney Benton (AFSCME) ¶ 4 (AFSCME member who receives child care

3   subsidy). Where CCDF funds are administered by localities, members of Plaintiffs AFSCME and

4   SEIU perform this administrative work. *See* Sforza Dec. (AFSCME) ¶ 9, 12, 23, 25, 37, 49; *see also*

5   Ex. M, Declaration of David Thurlkill (SEIU), ¶¶ 2, 6.

6          CCDF is administered by HHS and is made up of two separate sources of funding: the Child

7   Care Entitlement to States ("CCES") and the Child Care and Development Block Grant ("CCDBG").

8   CCES is a statutory entitlement that is not subject to the annual appropriations process. Rather,

9   Congress determined that "each State shall, for the purpose of providing child care assistance, be

10  entitled to payments" in an amount calculated based on sums paid to the state between 1992 and 1995.

11  42 U.S.C. § 618(a)(1). CCDBG is subject to the annual appropriations process. By statute, the

12  allocation and payment of those funds to states is mandatory. Under 42 U.S.C. § 9858h, "a State that

13  has an application approved by the Secretary … shall be entitled to a payment under this section for

14  each fiscal year in an amount equal to its allotment under section 9858m." That section, in turn, lays

15  out a mandatory formula for allocation of CCDBG funding for each state.

16         For 2025, Congress directed that $2.4 billion in federal funding would be provided to the

17  Targeted States through CCDF: $1.09 billion to California, $140 million to Colorado, $412 million

18  to Illinois, $185 million to Minnesota, and $638 million to New York. Ex. 34. Congress requires that,

19  in order to receive this funding, each state must "prepare and submit" a "State plan" that certifies that

20  the state has certain procedures and protections in place and describes the state's training and

21  professional development requirements, child care standards (including child-to-provider ratio), and

22  health and safety requirements, among other requirements. 42 U.S.C. § 9858c. The statute further

23  directs that the HHS Secretary "shall approve" any application that meets these requirements. *Id.* The

24  states administer their CCDF funding program in accordance with their respective federally approved

25  state plan. Each state sets payment rates for child care providers. Participating parents, including

26  Plaintiffs' members, may enroll their child with a provider who has a grant or contract with the state

27  such as Plaintiffs' members. *See* Ex. O, Declaration of Kimberly Bianchini (MSA) ¶¶ 7-11

28  Pls.' Mem. ISO Mot. for Stay Under

1    (describing process by which CCDF funds flow to providers and parents); *see also* Ex. B, Declaration

2    of Juana Cortez (AFSCME) at ¶ 4. Alternatively, parents may receive a voucher to purchase child

3    care from an eligible provider of their choice. Sforza Dec. (AFSCME) ¶¶ 11, 17, 33–35; Ex. A, Benton

4    Dec. (AFSCME) at ¶ 4.

5    **2.   HHS ignores statutory and regulatory procedures to freeze nearly $2.4 billion in**
       **federal CCDF program funding to the Targeted States**

6

7          Before HHS may terminate or refuse to release CCDF funds due to an alleged violation, it

8    must first comply with a series of procedural steps. Initially, HHS must conduct a "review or

9    investigation [that] reveals evidence that" a state or its subgrantee "has failed to substantially comply

10   with" applicable law or regulations or receives a complaint that a state "has failed to use its allotment

11   in accordance with" law or regulations. 45 C.F.R. §§ 98.90(b), 98.93(a). In the event the investigation

12   reveals evidence that may support a compliance failure, HHS must provide recipients with reasonable

13   notice and the opportunity for a hearing before implementing a penalty against a state for

14   noncompliance. *See* 45 C.F.R. §§ 98.90(b), 98.93(c). Specifically, Defendants must "issue a

15   preliminary notice … of possible non-compliance" to the state. 45 C.F.R. § 98.90(b). If the non-

16   compliance is based on a complaint, Defendants must "promptly furnish a copy of any complaint to

17   the affected" state. 45 C.F.R. § 98.93(c). A state then has a sixty-day period to submit comments. 45

18   C.F.R. §§ 98.90(b), 98.93(c). Defendants must then consider the state's comments. *Id.*

19         If HHS ultimately makes a finding that the state has made expenditures that are not allowed

20   by law, it must notify the state in writing of its decision to disallow those expenditures. 45 C.F.R.

21   § 98.66(b). During this process, the state has two opportunities to appeal. *See* 45 C.F.R. § 98.66(i)

22   (enabling state to appeal agency makes a non-compliance finding); 45 C.F.R. § 98.66(c) (enabling

23   state to request agency reconsider or appeal a decision to disallow funds). Upon a final decision, a

24   state's sanction can be the disallowance of funds in the specific amount found to be paid not in

25   accordance with law or an offset of future payments in that same amount, 45 C.F.R. § 98.65(d); *see*

26   *also* 45 C.F.R. §§ 98.66(a), (h), or to impose other "appropriate sanctions," 45 C.F.R. § 98.92(b). This

27   limits HHS to disallowing specific dollar amounts of CCDF funds and does not allow for a blanket

28   Pls.' Mem. ISO Mot. for Stay Under
     5 U.S.C. § 705 and Preliminary Injunction                                Case No. 3:26-cv-00759

freeze of nearly $2.4 billion to five different states. The law here circumscribes HHS to a scalpel rather than a hatchet approach when addressing irregularities or noncompliance with CCDF fund requirements.

The CCDF letters announcing the Targeted States Funding Freeze do not acknowledge any of these statutory or regulatory obligations. The only legal citation in the CCDF letters is to 45 C.F.R. § 98.67(c)(2), which simply requires states to have "[f]iscal control and accounting procedures … sufficient to permit … [t]he tracing of funds to a level of expenditure adequate to establish that such funds have not been used in violation of the provisions of this part."

### B. TANF Program Assistance Fund

#### 1. Background

TANF is a block grant program that helps fund state-run initiatives providing cash assistance and a range of other benefits and services for needy families with children, including child care assistance, employment and training programs, services for children at risk of neglect or abuse, and after-school youth programs. Ex. 35 ("TANF Primer"). It is one of the largest sources of cash assistance to low-income American families and a crucial component of helping families with children achieve economic security and stability.

TANF funds are allocated according to a mandatory formula based on the share each State had of TANF funding in 2002. 42 U.S.C. § 603(a)(1) ("Each eligible State shall be entitled to receive…"). Ex. 35, TANF Primer at 2 n.6.[5] Congress appropriated $16,566,542,000 to TANF in the Continuing Appropriations and Extensions Act. Pub. L. No. 119-37, 139 Stat. 497 (2025); Pub. L. No. 118-42, 138 Stat. 418 (2024); 42 U.S.C. § 603(a)(1)(C). In FY 2023, Congress allocated more than $7 billion to the Targeted States: $3.6 billion to California, $135 million to Colorado, $583 million to Illinois, $260 million to Minnesota, and $2.4 billion to New York. Ex. 35, TANF Primer at 3-4. A state is eligible for TANF funding if it submits to the Secretary a plan outlining how the

---

[5] For example, the 2002 allocations were based on a formula created in the 1996 Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), under which allocations were calculated based on shares of different program expenditures from 1992-1995.

1   state will conduct the TANF program in compliance with federal work requirements, privacy

2   protections, and other provisions. 42 U.S.C. § 602(a). As with their CCDF programs, states administer

3   their TANF program consistent with their federally approved state plan.

4        States then distribute TANF funds to low-income individuals, including Plaintiffs' members,

5   who meet an array of financial and non-financial requirements to help pay for food, shelter, child

6   care, and utilities, among other expenses. States typically distribute these funds through state or

7   county human service agencies. In the Targeted States, Plaintiff AFSCME's members work for state

8   and county human services agencies that administer these funds and whose jobs are in part funded by

9   this money. *See, e.g.*, Sforza Dec. (AFSCME) ¶¶ 5–13, 23–25, 30, 37–39, 49. Members of Plaintiff

10   SEIU perform similar work as employees of state or local agencies in Targeted States, such as

11   California and Colorado. Peterson Dec. (SEIU) ¶¶ 6, 13, 20; *see also* Ex. G, Declaration of Ruby Dye

12   (SEIU) ¶ 4; Thurlkill Dec. (SEIU) ¶ 2.

13       **2.   HHS ignores statutory and regulatory procedures to freeze nearly $7.35 billion in**
     **federal TANF funding to Targeted States**

14

15       The TANF statute provides specific and exclusive circumstances in which Defendants may

16   implement a penalty against a state for noncompliance in the TANF program, including a state's

17   failure to submit required reports, failure to comply with child support enforcement obligations, and

18   a "[g]eneral penalty" for when a state's statutorily required audit finds that a state's funds have been

19   used in violation of the law. 42 U.S.C. § 609(a); 45 C.F.R. § 263.10. Defendants must follow specific

20   procedures in order to implement these penalties. *See* 42 U.S.C. § 617. In fact, the statute sets strict

21   limits on how TANF may be regulated by HHS, stating that "[n]o officer or employee of the Federal

22   Government may regulate the conduct of States under" the TANF program "except to the extent

23   expressly provided in this part." *Id.*

24       First, HHS must notify a state of the violation, in writing, specifying which penalty will be

25   imposed and why, along with the sources and reasoning behind the decision, and inviting the state to

26   present counterarguments. 42 U.S.C. § 609(c)(1)(A); 45 C.F.R. § 262.4(a). The state then has a sixty-

27   day period to submit a corrective compliance plan that outlines how the state will correct or

28   Pls.' Mem. ISO Mot. for Stay Under

1   discontinue the violation and how the state will ensure continuing compliance. 42 U.S.C.

2   § 609(c)(1)(A)-(B). Only if HHS rejects the state's proposed compliance plan within 60 days can it

3   impose penalties on the state. 42 U.S.C. § 609(c)(1)(D), (c)(2); *see also* 42 U.S.C. § 609(c)(3). If

4   HHS takes any adverse action against a state—which may include the imposition of a penalty as

5   described above but may also include an adverse action on the state's TANF plan—it must notify the

6   state within five days. 42 U.S.C. § 610(a). This notification must include "the factual and legal basis

7   for taking the penalty in sufficient detail for the State to be able to respond in an appeal." 45 C.F.R.

8   § 262.7(a)(2). In this scenario, the state has 60 days to appeal. 42 U.S.C. § 610(b)(1). Upon a final

9   decision, the penalty for the state is a dollar-for-dollar reduction in future payments—which can be

10  increased by an additional 5% if HHS finds that the violation was intentional—to the state in the

11  amount that was unlawfully spent. 42 U.S.C. § 609(a)(1)(A), (B). Congress prohibited HHS from

12  reducing the quarterly payment to any state by more than 25%. 42 U.S.C. § 609(d)(1). If this limitation

13  results in unrecovered penalties, the balance is carried forward and assessed the following year. 42

14  U.S.C. § 609(d)(2). HHS did not take any of the required procedural steps before freezing $7 billion

15  in TANF funding to the Targeted States.

16          The TANF letters do not acknowledge any of these statutory or regulatory obligations that

17  HHS must follow prior to imposing a penalty on a state's funds. The TANF letters cite an Office of

18  Management and Budget ("OMB") regulation, 2 C.F.R. § 200.339, but that regulation does not

19  supersede the processes and limits set forth by Congress in enacting TANF and, in any event, HHS

20  did not even attempt to comply with the procedural requirements of that regulation.

21      **C. The SSBG Program Assistance Fund**

22          **1. Background**

23          The SSBG program is a funding source providing approximately $870 million annually to the

24  Targeted States to provide them with "flexibility" and funding to support social services in one of

25  five categories: (1) "achieving or maintaining economic self-support"; (2) "achieving or maintaining

26  self-sufficiency"; (3) addressing "neglect, abuse, or exploitation" of children and vulnerable adults;

27  (4) preventing institutional care and supporting community-based care; and (5) where institutional

28  Pls.' Mem. ISO Mot. for Stay Under

care is needed, supporting application and admission and providing services to institutionalized individuals. 42 U.S.C. § 1397. Like TANF money, SSBG funding is largely utilized at the local or county level, where, for example, members of Plaintiffs AFSCME and SEIU work as public benefits administrators. *See*, *e.g.*, Sforza Dec. (AFSCME) ¶¶ 5–13, 23–25, 30, 37–39, 49; Dye Dec. (SEIU) ¶ 4.

Congress has required that SSBG funds must be allocated based on each State's percentage of the national population, based on census data. 42 U.S.C. § 1397b(b). Payment of this funding to the States is not optional. 42 U.S.C. § 1397a provides that "[e]ach State shall be entitled to payment under this division for each fiscal year in an amount equal to its allotment," and that "[t]he Secretary shall make payments … to each State[.]" Unlike CCDF and TANF, States are not required to submit a plan to be eligible for SSBG funding. Instead, Congress opted to require an annual report describing how the state used the funds in the year prior. 42 U.S.C. § 1397e; *see also* 45 C.F.R. § 96.74. In FY 2024, Congress appropriated $1.7 billion for SSBG. Pub. L. No. 118-47, 138 Stat. 665 (2024). FY 2025 and current funding was continued at that level. Pub. L. No. 118-83, 138 Stat. 1533 (2024); Pub. L. No. 119-37, 139 Stat. 497 (2025).

### 2. HHS ignores statutory and regulatory procedures to freeze nearly $869 million in federal SSBG Funding to Targeted States

HHS may implement a penalty against a state for noncompliance in the SSBG program only after following specific procedural steps. 42 U.S.C. § 1397e(b); 45 C.F.R. § 96.51. Defendants must first provide the state with notice of a finding for noncompliance and provide the state with the opportunity for a hearing to contest this finding. *Id.* After the hearing, the state may appeal. 45 C.F.R. § 96.52. Upon a final decision, the sanction for the state is disallowance of funds in the amount found to be paid not in accordance with law or an offset of future payments in that same amount. 45 C.F.R. § 96.51(a), (b). HHS can "withhold funds from a State *only if* the Department has provided the State an opportunity for a hearing." 45 C.F.R. § 96.51(c) (emphasis added). If HHS receives a complaint that a state "has failed to use its allotment … in accordance with" law or regulations, it must "promptly furnish a copy of any complaint to the affected State." 45 C.F.R. § 96.50(c). The state then has a sixty-

1   day period to submit comments in response to the complaint, which HHS must consider. *Id*.

2   In considering a complaint or the results of an audit, HHS recognizes that "the States are

3   primarily responsible for interpreting the governing statutory provisions," and that is "consistent with

4   the intent of and statutory authority for the block grant programs." 45 C.F.R. § 96.50(e). As a result,

5   HHS "will defer to a State's interpretation of its assurances and of the provisions of the block grant

6   statutes unless the interpretation is clearly erroneous." *Id*. HHS did not take any of the required

7   procedural steps before freezing $870 million in SSBG funding to the Targeted States. The SSBG

8   letters do not acknowledge any of these statutory or regulatory obligations that Defendants must

9   complete prior to penalizing a state's SSBG funding.

10   **D. HHS Also Unlawfully Conditions Future Fund Disbursements on Far-Reaching**
        **Demands**

11

12   In addition to implementing a blanket freeze on three grant programs, Defendants also have

13   demanded copious information from each of the states, such as, for example, "the complete universe

14   of TANF administrative data that exists and are in the state's possession for all recipients for all

15   available years," including "recipient name, address, Social Security Number (if collected), date of

16   birth," and more. *See, e.g.*, Ex. 31 at 2. The freeze letters sent to officials of the Targeted States with

17   notice of the freeze, inform recipients that all CCDF, TANF, and SSBG program funds will be "placed

18   on [a] temporary restricted drawdown"—meaning, unable to draw funds under any of the three

19   programs—until further notice. *See, e.g.*, Ex. 31 at 2.

20   CCDF statutes and regulations prescribe a number of ways in which HHS monitors states'

21   compliance with program requirements, including potential fraud, and the manner in which data and

22   records can be provided from states to the agency. For example, Congress has specified that each

23   state must undergo regular audits; must report certain data regularly; and must undergo a quality

24   control process through which HHS calculates the rate of improper payments. *See* 42 U.S.C.

25   § 9858(i); 45 C.F.R. §§ 98.65, 98.100. HHS failed to acknowledge any of these oversight mechanisms

26   before freezing CCDF funds.

27   TANF statutes and regulations also prescribe a number of ways in which Defendants monitor

28

compliance with program requirements, including potential fraud, and the manner in which data and records can be provided from states to Defendants in furtherance of its compliance efforts. For example, Congress has specified that each state must undergo regular audits; must report certain data to HHS regularly; and must conduct a quality control system covering determinations of eligibility, reviewed by HHS. *See* 42 U.S.C. §§ 611, 652; 45 C.F.R. pt. 265. HHS likewise did not acknowledge any of these oversight mechanisms in implementing the Targeted States Funding Freeze as to TANF. The TANF letter cites a regulation in support of its data demand, 45 C.F.R. § 98.90. But this regulation relates to CCDF, not TANF, and in any event provides specific procedural steps HHS must take (and did not take here) to issue a finding of non-compliance for that program, as described above.

Lastly, SSBG statutes and regulations also prescribe a number of ways in which HHS monitors states' compliance with program requirements, including potential fraud, and the manner in which data and records can be provided from states to the agency. For example, Congress has specified that each State must undergo regular audits and must report certain data to HHS regularly. *See* 42 U.S.C. § 1397e; 45 C.F.R. § 96.74. HHS likewise did not acknowledge any of these oversight mechanisms in implementing the Targeted States Funding Freeze as to SSBG.

Moreover, even assuming HHS and ACF followed all the procedures required by law and the enacting regulations, and made a finding of misuse, a penalty in the form of a blanket freeze on an entire federal assistance program is still not allowed. In fact, Congress limited Defendants' authority to withhold congressionally appropriated dollars in levying penalties. *See, e.g.*, 42 U.S.C. §§ 609(a)(1)(A), (B) (TANF) (enabling HHS, at the conclusion of an investigation and upon a finding on noncompliance, to impose a state a dollar-for-dollar reduction in future payments to the state in the amount that was unlawfully spent, which can be increased by an additional 5% if HHS found the violation was intentional); *id.* § 609(d)(1) (TANF) (prohibiting HHS from reducing the quarterly payments to any state by more than 25%); *id.* § 9858g(b)(2)(A)(ii) (CCDF); *id.* §§ 1397a(a)(1), 1397e(b) (SSBG).

## III.   A Loss of Federal Funding Would Wreak Catastrophic and Irreparable Harms on Plaintiffs' Members

The Targeted States Funding Freeze has already disrupted child care systems in the Targeted States, at the expense of the children and parents who rely on them each day. For example, after the freeze was announced, Plaintiffs' members operating child care centers for families using subsidies have started to make difficult choices, such as limiting purchases of new or updated educational materials, from books to art supplies, and further delaying hiring additional staff, including supporting staff for children with special needs. *See*, *e.g.*, Cortez Dec. (AFSCME) ¶ 8; Ex. C, Declaration of Erika Prado (AFSCME) ¶ 6; Ex. D, Declaration of Janna Rodriguez (AFSCME) ¶¶ 12–14. Members who rely on subsidies to own and operate child care centers already run on operational budgets with thin margins, so the freeze will force them to shut down operations almost immediately. *See* Cortez Dec. (AFSCME) ¶¶ 3–7; Prado Dec. (AFSCME) ¶¶ 5, 7–8; Rodriguez Dec. (AFSCME) ¶¶ 7–11, 15; Ex. F, Declaration of Wendy Bobadilla (SEIU) ¶ 11, 13. Plaintiffs' members who are parents depending on grant funds to afford child care are terrified by the freeze because it would require leaving their jobs (and risking their livelihoods) to take care of their children. *See, e.g.*, Benton Dec. (AFSCME) ¶¶ 5–9. Other of Plaintiffs' members working as full-time employees of subsidized child care centers are at risk of losing their jobs, and Plaintiffs' ability to bargain fair employment terms and conditions for these essential workers is immediately diminished as a result. *See, e.g.*, Sforza Dec. (AFSCME) ¶¶ 32-33. Moreover, the freeze is also already harming state and local government employees, also members of Plaintiffs' organizations, whose jobs are funded through the frozen grant programs and who administer the CCDF, TANF, and/or SSBG programs in all five Targeted States. Some of these union members' employers already forecast significant cuts in services they may provide as well as layoffs, which in addition to destabilizing these members' livelihoods, has also weakened their and Plaintiffs' ability to secure fair terms in active collective bargaining negotiations. *Id*. ¶¶ 8, 10, 13, 23–28, 30–31, 38, 49.

## LEGAL STANDARD

A preliminary injunction is granted when the moving party (1) is likely to succeed on the merits; (2) irreparable harm is likely without preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. Fed. R. Civ. P. 65(a); *Winter v. Nat.*

1   *Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). Alternatively, if there are "serious questions going to

2   the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction

3   may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter*

4   factors are satisfied." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (cleaned

5   up). A stay of an agency action under 5 U.S.C. § 705 of the APA "is governed by the [same]

6   preliminary injunction factors." *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1015 (9th Cir. 2025); *see* 5

7   U.S.C. § 705 (allowing courts to "issue all necessary and appropriate process to postpone the effective

8   date of an agency action or … preserve status or rights pending conclusion of the review

9   proceedings").

10  ## ARGUMENT

11  ## I.   Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims

12          Plaintiffs are likely to succeed on their claims that defendants have violated the APA, or at a

13  minimum have raised serious questions going to the merits of their claims.

14  ### A.  The Targeted States Funding Freeze is Final Agency Action

15          Plaintiffs challenge the Targeted States Funding Freeze as final agency action. Agency action

16  is final if it (1) "mark[s] the consummation of the agency's decisionmaking process" and (2)

17  determines "rights [and] obligations" or if "legal consequences will flow" from it. *Bennett v. Spear*,

18  520 U.S. 154, 156, 178 (1997) (internal quotations omitted); *see S.F. Herring Ass'n v. DOI*, 946 F.3d

19  564, 577–78 (9th Cir. 2019). Finality is evaluated "in a pragmatic and flexible manner." *Or. Nat.*

20  *Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006); *U.S. Army Corps of Eng'rs v.*

21  *Hawkes Co.*, 578 U.S. 590, 599 (2016). The Targeted States Funding Freeze clearly constitutes final

22  agency action reviewable under the APA. The Targeted States Funding Freeze meets the first *Bennett*

23  prong because it is a "definitive position" and not "merely tentative." *S.F. Herring Ass'n*, 946 F.3d at

24  578. HHS has not merely announced it was considering freezing funds to the Targeted States. Instead,

25  each of ACF's letters to the Targeted States announces that funds would be withheld, effective

26  immediately. *See, e.g.*, Exs. 17, 31.. The letters marked the consummation of the agency's

27

28

1    decisionmaking process as to whether funds would continue to flow to the Targeted States. *See City*

2    *& Cnty. of San Francisco v. Trump*, 783 F.Supp.3d 1148, 1199 (N.D. Cal. 2025).

3          The Targeted States Funding Freeze also meets the second *Bennett* prong, because it has a

4    "direct and immediate effect on the day-to-day operations of the subject party." *Oregon Nat. Desert*

5    *Ass'n*, 465 F.3d at 987 (cleaned up). "[T]he [action] has the status of law or comparable legal force,

6    and ... immediate compliance with its terms is expected." *Id.* The freeze has already had a "direct and

7    immediate effect on the day-to-day operations" of the Targeted States and their residents who rely on

8    the federal support of these programs. *Id.* (collecting cases regarding features of finality); *infra*,

9    Section III.

10         **B. The Targeted States Funding Freeze is Contrary to Law and In Excess of**
11              **Statutory Authority**

12         "Administrative agencies are creatures of statute. They accordingly possess only the authority

13   that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022); *see Ctr.*

14   *for Food Safety v. Regan*, 56 F.4th 648, 659 (9th Cir. 2022). "An agency literally has no power to act

15   unless and until Congress confers power upon it." *Am. Fed'n of Gov't Employees v. Trump*, 139 F.4th

16   1020, 1037 (9th Cir. 2025) (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986))

17   (cleaned up); *see also City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). Congress has not

18   authorized HHS to impose the immediate and total freeze of funding on the Targeted States.

19   Moreover, numerous statutory and regulatory provisions establish processes that HHS is required to

20   follow when it seeks to impose penalties on state recipients—provisions HHS ignored here. The

21   freeze accordingly is contrary to law and in excess of statutory authority, should be stayed pursuant to

22   5 U.S.C. § 705 and its enforcement enjoined, and ultimately set aside pursuant to 5 U.S.C. § 706.

23         Each of the three programs at issue here requires HHS to follow specific procedures before it

24   imposes any penalty against a state for noncompliance. *See supra* at 7-15 (detailing the statutory and

25   regulatory schemes). For example, under CCDF, HHS is permitted to claw back funds from a state

26   only after "reasonable notice" and "opportunity for a hearing," and after finding that the state has

27   failed to "comply substantially" with the terms of its approved plan or of the governing statute. 42

28

U.S.C. § 9858g(b)(2)(A)-(C). HHS is required to provide any complaint alleging misconduct to the affected state, permit the state to respond to the agency's notice and the complaint, and to consider the state's response. 45 C.F.R. §§ 98.90(b), 98.93(c). With respect to TANF, HHS is required to notify a state of a suspected violation, and to provide the state with an opportunity to enter into a corrective compliance plan, "before imposing a penalty against a state." 42 U.S.C. § 609(c)(1)(A). HHS must further provide the state with notice of the finding of a violation and provide it with an opportunity for an administrative appeal; any penalty may be imposed only after the appellate process is completed. 42 U.S.C. § 610(a); 45 C.F.R. § 262.4(a), (g). And as for SSBG, HHS likewise was obliged to provide the state with written notice and an opportunity for a hearing—including an opportunity to respond to any external complaints alleging wrongdoing—before the federal agency may cut off funding for the state. 45 C.F.R. §§ 96.50(c), 96.51(a); *see also id.* § 96.51(c) (HHS can "withhold funds from a State only if the Department has provided the State an opportunity for a hearing"). Yet HHS observed none of these required procedures when it decided to impose the Targeted States Funding Freeze. Its disregard of the governing statutes and regulations renders the funding freeze unlawful under the APA. *See, e.g.*, *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1021 (9th Cir. 2025) (an "agency is not free to disregard" procedures required by law).

Congress did not grant HHS the authority, under any of these programs, to penalize states on the basis of unsubstantiated allegations of misconduct. To the contrary, under each of these programs, HHS is required to make a finding of noncompliance before it imposes any penalty. *See* 42 U.S.C. § 9858g(b)(2)(A)-(B) (requiring agency to "find" noncompliance under CCDF); 42 U.S.C. § 609(a)(1)(A) (same for TANF; 42 U.S.C. § 1397e(b) (requiring agency to have "ultimately found" noncompliance under SSBG). But HHS did not make any finding whatsoever that any of the Targeted States had failed to comply with the governing statutes. Instead, HHS only provided boilerplate language in each of its letters to the Targeted States citing an unspecified "concern[]" about "potential" fraud, without presenting evidence supporting such a concern, let alone making a finding that any misconduct had actually occurred. HHS acted in disregard of the specific legal constraints

1    authorizing it to impose such penalties only after making such a finding. This was unlawful. *See Nat'l*

2    *Fed'n of Indep. Bus. v. OSHA*, 595 U.S. at 117.

3        What is more, even if HHS had observed its statutory requirements and had found that the

4    Targeted States had committed actionable misconduct, its funding freeze decision would still be

5    unlawful. To put it another way, while its procedural failures were egregious, HHS erred on the

6    substance as well. Congress has not granted the agency the authority to cut off the entire stream of

7    funding under CCDF, TANF, or SSBG. Instead—apart from a limited set of specified additional

8    sanctions—the governing statutes authorize HHS to impose only dollar-for-dollar reductions in

9    amounts payable as an offset for any improperly spent funds. Under CCDF, Congress authorized

10   HHS to seek dollar-for-dollar reimbursement of improperly spent funds, 42 U.S.C.

11   § 9858g(b)(2)(A)(ii), and further authorized the agency to seek the additional sanction of

12   disqualification from receipt of future funds only with respect to the discretionary, block grant,

13   portion of CCDF, and not also for the mandatory Child Care and Development Block Grant portion

14   of CCDF funding. And even with respect to those discretionary funds, HHS could only seek

15   disqualification after providing notice and a hearing and making a "finding of noncompliance." 42

16   U.S.C. § 9858g(b)(2)(B). Likewise, under TANF, Congress authorized the agency to seek a dollar-

17   for-dollar reduction as a penalty for improperly spent funds and to further seek an additional five

18   percent penalty for intentional noncompliance. Congress further mandated that, regardless of any

19   penalty imposed, HHS "shall not reduce any quarterly payment to a State by more than 25 percent."

20   42 U.S.C. §§ 609(a)(1), 609(d); *see also id*. §§ 609(a)(2)–(16) (other limited penalties). Underscoring

21   the limited nature of this grant of authority, Congress specified that HHS may not "regulate the

22   conduct of States under this part or enforce any provision of this part, except to the extent expressly

23   provided in this part." 42 U.S.C. § 617. And as to SSBG, Congress specified that states "shall be

24   entitled" to their appropriated amounts and authorized HHS only to require states to "repay to the

25   United States amounts ultimately found not to have been expended in accordance with" law or to

26   "offset such amounts against" future SSBG payments to the state. 42 U.S.C. §§ 1397a(a)(1), 1397e(b).

27

28

1    HHS's imposition of a blanket freeze on all funding for the Targeted States under these programs

2    thus exceeded the agency's legal authority.

3         In arrogating to itself the power to adjust funding streams to the Targeted States, HHS

4    disregarded congressional statutes making specific appropriations for each of these three programs

5    and requiring HHS to issue funds to the states under formulas set by Congress itself. *See* 42 U.S.C.

6    §§ 618, 9858h, 9858m (CCDF); 42 U.S.C. § 603(a)(1)(B) (TANF); 42 U.S.C. § 1397b(b) (SSBG).

7    Where, as here, Congress has appropriated funds for specific programs, "an agency is not free simply

8    to disregard statutory responsibilities." *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993); *see also Comm.*

9    *Legal Services in E. Palo Alto v. U.S. Dep't of Health & Human Servs*., 137 F.4th 932, 940 (9th Cir.

10   2025). Nothing in any of these statutes grants HHS the authority to depart from the congressionally

11   set formulas for allocating appropriations among all fifty states simply out of the agency's desire to

12   further the President's agenda of retaliation against the Targeted States. "Absent congressional

13   authorization, the Administration may not redistribute or withhold properly appropriated funds in

14   order to effectuate its own policy goals." *City & County of San Francisco v. Trump*, 897 F.3d 1225,

15   1235 (9th Cir. 2018); *see Washington v. U.S. Dep't of Transp.*, 792 F.Supp.3d 1147, 1187 (W.D.

16   Wash. 2025); *New York v. Trump*, 769 F.Supp.3d 119, 140 (D.R.I. 2025).

17        The foregoing should demonstrate that HHS lacked the authority to cut off funding for the

18   Targeted States under CCDF, TANF, or SSBG and failed to observe the procedures required under

19   the statutes and regulations governing each program. But HHS committed yet an additional legal

20   error: even if the agency did have the authority to impose conditions on the states' funding stream

21   under these programs, it lacked any legal basis to tie funding to the states' compliance with impossible

22   data demands, such as the "complete universe" of the states' data "for all available years." Exs. 15,

23   16, 19. Each program's statutes and regulations set forth mechanisms that HHS may use to monitor

24   states' compliance with program requirements. 42 U.S.C. § 9858i (CCDF); 42 U.S.C. §§ 611, 652

25   (TANF); 42 U.S.C. § 1397e (SSBG). HHS ignored these mechanisms, instead making up its own

26   requirements without legal basis. As to TANF and SSBG, HHS instead sought the sensitive

27   information of millions of the Targeted States' residents (including Plaintiffs' members), including

28

1    Social Security numbers and dates of birth, with no provisions for privacy protections or limitations

2    on the use of data. There is no source of authority—and HHS certainly has cited none—that could

3    justify such a request, and numerous statutes, which HHS ignored, restrict the agency's ability to

4    request or use such data. *See* 5 U.S.C. § 552a(e)–(f) (Privacy Act); 44 U.S.C. § 3507(a)(1)(D)

5    (Paperwork Reduction Act); 44 U.S.C. § 3553(a)(2) (Federal Information Security Management Act);

6    Pub. L. No. 100-503, § 2, 101 Stat. 2507 (Computer Matching and Privacy Protection Act of 1988).

7    ACF only cited to 45 C.F.R. § 98.90 as supposed support for the SSBG and TANF demands, but that

8    regulation does not relate to the TANF program, and in any event requires procedures that HHS

9    ignored. Moreover, the TANF statute specifically prohibits HHS from requiring states to provide data

10   for all participants. 42 U.S.C. § 611(a)(1)(B)(i). And, as to CCDF, HHS seeks to require the Targeted

11   States to provide onerous documentation of each expense as part of the "[f]iscal control and

12   accounting procedures" required by 45 C.F.R. § 98.67(c), but that regulation provides that the

13   states—not HHS—"expend and account for CCDF funds in accordance with their own laws and

14   procedures for expending and accounting for their own funds." 45 C.F.R. § 98.67(a) (emphasis

15   added).

16        At bottom, HHS has not provided any legal justification for the Targeted States Funding

17   Freeze. Indeed, the CCDF and SSBG letters fail to cite any potentially relevant source of authority at

18   all. And the TANF letter cites only to 2 C.F.R. § 200.339, an OMB umbrella regulation that HHS has

19   adopted to govern that agency's grant awards, "unless a … Federal statute provides otherwise." 2

20   C.F.R. § 200.101(a)(2); *see also id.* § 300.106. In other words, "Federal statutes or regulations govern

21   in any circumstances where they conflict with" 2 C.F.R. § 200.339. *See id.* § 200.101(d), 200.106.

22   Here, the specific provisions governing noncompliance detailed above control over any contrary

23   provision in 2 C.F.R. § 200.339. The regulation simply does "not give [HHS] a blank check to ignore"

24   the statutes' limits and to "nullify the safeguards" imposed by Congress. *Am. Ass'n of Univ.

25   Professors v. Trump*, No. 25-CV-07864-RFL, 2025 WL 3187762, at *28 (N.D. Cal. Nov. 14, 2025),

26   *appeal docketed*, No. 26-263 (9th Cir. Jan. 13, 2026). In any event, even if Section 200.339 did apply

27   here, it comes with its own set of procedural requirements before any agency could "temporarily

28   Pls.' Mem. ISO Mot. for Stay Under

1    withhold payments." 2 C.F.R. 200.339(a). HHS completely failed to follow those requirements. HHS

2    did not make any "determin[ation] that noncompliance cannot be remedied by imposing specific

3    conditions." *Id.* § 200.339; *see id.* § 200.208(c). Nor did it provide the Targeted States "with an

4    opportunity to object and provide information challenging" the freeze, as required. 2 C.F.R.

5    § 200.342. These procedural defects alone render HHS's actions unlawful. *See Porwancher v. Nat'l*

6    *Endowment for Humanities*, 792 F. Supp. 3d 107, 114 (D.D.C. 2025).

7            The government may argue in defense that it has not sought to freeze funding upon a finding

8    of noncompliance, but that it has only withheld funding as a tool that it could use to monitor states'

9    compliance with program requirements, as a preliminary step before it ultimately imposes the

10   sanction of withholding either some or all funding. Such an argument would be a distinction without

11   a difference. After all, "indefinite suspensions differ from a termination in name only." *Thakur v.*

12   *Trump*, 795 F.Supp.3d 1168, 1174 (N.D. Cal. 2025). *See also Washington v. U.S. Dep't of Transp.*,

13   792 F.Supp.3d at 1187 (agency violated Congressional requirements to distribute funds by imposing

14   "temporary pause" on distributing funds). The governing statutes and regulations require HHS to

15   observe specific procedures before penalizing the Targeted States. HHS failed to recognize the

16   limitations on its authority, and it thus acted contrary to law and without statutory authority, no matter

17   what nomenclature it wishes to use to describe the Targeted States Funding Freeze.

18                   **C.  The Targeted States Freeze is Arbitrary and Capricious**

19           The Targeted States Funding Freeze is the height of unreasoned and unreasonable agency

20   action, a sweeping change issued without basis or any consideration of the widespread harm it will

21   cause. It is unlawfully arbitrary and capricious and should be set aside. *See* 5 U.S.C. § 706(2)(A) (A

22   court shall "hold unlawful and set aside agency action … found to be arbitrary [or] capricious.").

23   "[T]he touchstone of 'arbitrary and capricious' review … is 'reasoned decisionmaking.'" *Altera Corp.*

24   *& Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1080 (9th Cir. 2019) (quoting *Motor*

25   *Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)). The APA

26   requires an agency to provide "a satisfactory explanation for its action[,] including a rational

27   connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal

28   Pls.' Mem. ISO Mot. for Stay Under

1  quotation marks omitted). The Targeted States Funding Freeze is arbitrary and capricious not only

2  because it conflicts with governing statutes and regulations, but also because: (a) the action is not

3  "reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021);

4  (b) HHS failed to examine evidence or data, *see Dep't of Com. v. New York*, 588 U.S. 752 (2019);

5  (c) HHS "overlooked alternatives" to the problem before it, *see Nebraska v. Su*, 121 F.4th 1, 17 (9th

6  Cir. 2024); and (d) HHS failed to account for substantial reliance interests, *see Dep't of Homeland*

7  *Security v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020).

8  **1.  The Targeted States Freeze is not reasonable nor reasonably explained**

9        HHS offered no reasonable explanation for freezing the Targeted States'—and *only* the

10  Targeted States'—CCDF, TANF, and SSBG funding. The administration's public statements reveal

11  that HHS targeted California, Colorado, Illinois, Minnesota, and New York based on the political

12  affiliations and viewpoints of their elected leadership. The APA, however, forecloses reliance on a

13  "factor[] which Congress has not intended [the agency] to consider." *State Farm*, 463 U.S. at 43. The

14  political leanings of each Targeted State's leadership are extra-statutory factors that do not "provide

15  a rational basis for why [d]efendants chose to terminate [p]laintiffs' grants over others." *City of Saint*

16  *Paul v. Wright*, No. 25-CV-03899, 2026 WL 88193, at *5 (D.D.C. Jan. 12, 2026). "This kind of

17  partisan motivation exemplifies arbitrary and capricious action." *Am. Fed'n of State Cnty. & Mun.*

18  *Emps., AFL-CIO v. U.S. Off. of Mgmt. & Budget*, No. 25-CV-08302-SI, 2025 WL 3018250, at *18

19  (N.D. Cal. Oct. 28, 2025) (finding RIFs of government employees that were "intended for the purpose

20  of political retribution" violated APA).

21        HHS's assertions of fraud, which are both unsupported and contrived, are poor veils for HHS's

22  true political animus. Before freezing funds, HHS expressed disdain for the Targeted States and

23  telegraphed its intent to withhold federal funding, *supra* at 3-6, notwithstanding that HHS had already

24  approved each state's plans for implementing each program (violating the statutes relating to those

25  plans, *see* 42 U.S.C. § 9858c (CCDF); 42 U.S.C. § 602(a) (TANF)). This court is "not required to

26  exhibit a naivete from which ordinary citizens are free" when facing "an explanation for agency action

27  that is incongruent with what the record reveals about the agency's priorities and decisionmaking

28  Pls.' Mem. ISO Mot. for Stay Under

1    process." *Dep't of Com.*, 588 U.S. at 785. It is apparent that HHS has made "decisions featuring

2    unjustifiable bias or partisanship," which "are precisely the types of agency actions that … work a

3    violation of the arbitrary-and-capricious standard." *Level the Playing Field v. FEC*, 961 F.3d 462,

4    464 (D.C. Cir. 2020) (quotation omitted).

5    ### 1.  HHS failed to examine relevant evidence or data

6    An agency must "examine[] the relevant data" when making a reasoned decision. *Dep't of*

7    *Com.*, 588 U.S. at 773 (quotation omitted). When an agency acts without any examination of any

8    evidence, its decision is arbitrary and capricious. *Id.; see also State Farm*, 463 U.S. at 43. HHS's

9    letters fail to cite or analyze any evidence or factual support of the "potential" fraud that HHS claims

10   justifies freezing the Targeted States' funding. Instead, HHS seeks evidence of fraud through

11   overburdening and excessive requests for data, *after* imposing the freeze. This post hoc attempt to

12   justify HHS's action is unlawful. *See Regents of Univ. of Cal.*, 591 U.S. at 22–23 (rationale not

13   contemporaneously provided in the record "can be viewed only as impermissible *post hoc*

14   rationalizations and thus are not properly before [the court]"); *see also Noem,* 2025 WL 2939119, at

15   *8-10 (holding that DHS acted arbitrarily and capriciously when it zeroed out funding for a state

16   agency because DHS failed to give a reasonable, contemporaneous, statutorily authorized basis for

17   its decision). HHS also fails to establish any legal basis that would justify its unreasonable demands

18   for the "complete universe" of states' data "for all available years," including sensitive information

19   about millions of states' residents. Exs. 15, 16, 17, 19.

20   ### 2.  HHS overlooked reasonable alternatives

21   Before freezing the Targeted States' funding, HHS was also obligated "to consider alternatives"

22   and had a duty "to give a reasoned explanation for its rejection of such alternatives." *Nebraska v. Su*,

23   121 F.4th 1, 17 (9th Cir. 2024) (internal quotations omitted). A failure to consider available

24   alternatives renders an agency's action arbitrary and capricious. *Id.*; *see also Spirit Airlines, Inc. v.*

25   *Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) ("An agency is required to consider

26   responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of

27   such alternatives." (internal quotations omitted)). Even if HHS had properly made a finding that

28   Pls.' Mem. ISO Mot. for Stay Under

1    misconduct had occurred (and no such finding has been made), the agency failed to evaluate the scope

2    and extent of any wrongdoing or consider any alternatives to a complete freeze on all program

3    funding. For example, each program's statutes and regulations provide mechanisms of information-

4    sharing and compliance monitoring. *See* 42 U.S.C. § 9858i; 45 C.F.R. §§ 98.65, 98.100 (CCDF's

5    compliance monitoring mechanisms requiring regular audits, quality control, and data reporting); 42

6    U.S.C. §§ 611, 652; 45 C.F.R. pt. 265 (same for TANF); 42 U.S.C. § 1397e (same for SSBG). HHS

7    did not acknowledge these oversight mechanisms, let alone explain why it did not pursue them.

8                    **3.  HHS failed to account for substantial reliance interests**

9        HHS also failed to account for the harm caused by the Targeted States Funding Freeze, including

10    the significant reliance interests at stake. Millions of children, parents and child care providers—

11    including Plaintiffs' members—in the Targeted States rely on consistent and predictable CCDF,

12    TANF, and SSBG program funding. *See infra*, Section III. HHS "did not acknowledge—much less

13    justify"—its choice to take a wrecking ball to these compelling interests, *Int'l Org. of Masters, Mates*

14    *& Pilots v. Nat'l Lab. Rels. Bd.*, 61 F.4th 169, 180 (D.C. Cir. 2023). Instead, the agency neglected "to

15    address whether there was a legitimate reliance" on the existing funding landscape and "weigh any

16    such interests against competing policy concerns." *See Regents*, 591 U.S. at 30, 33 (internal quotations

17    omitted). To "ignore" these "serious reliance interests" that "longstanding policies may have

18    engendered" is arbitrary and capricious. *Id.* at 30 (internal quotations omitted).

19    **II.  Plaintiffs and Their Members Will Continue to Suffer Increasingly**
20            **Irreparable Harm Absent Prompt Relief**

21        The serious harms documented by Plaintiffs are irreparable under the law. To obtain a stay or

22    preliminary injunction, plaintiffs must demonstrate that they are "likely to suffer irreparable harm in

23    the absence of preliminary relief." *Winter*, 555 U.S. at 20. The threat of irreparable harm must be

24    "likely" and not merely "possibility." *See id.* at 22. "[W]hile 'likely' is a higher threshold than

25    'possible,'" plaintiffs "need not prove that irreparable harm is certain or even nearly certain." *Small*

26    *v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191 (9th Cir. 2011).

27        Irreparable harm "is traditionally defined as harm for which there is no adequate legal remedy,

28    Pls.' Mem. ISO Mot. for Stay Under

such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citation omitted). Where Plaintiffs' members lose their jobs, there is no cause of action against the federal government for damages or back pay, rendering the harm irreparable. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). A plaintiff in an APA case suffers irreparable harm where agency action causes a "significant change in their programs and a concomitant loss of funding[.]" *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021). In a case involving Plaintiffs AFSCME and SEIU, for example, the Ninth Circuit has found irreparable harm when their members' jobs were threatened by an *en masse* federal government action, since back pay "cannot 'account for harms resulting from loss of income in the interim or for gaps in health and childcare that accompany job loss" and "does nothing to address the breadth and severity of harm alleged by … non-federal-employee[s]." *Am. Fed'n of Gov't Empl. v. Trump,* 139 F.4th 1020, 1040 (9th Cir. 2025). For unions in particular, the loss of bargaining strength in ongoing negotiations is also irreparable harm. *Am. Libr. Ass'n v. Sonderling*, No. CV 25-1050 (RJL), 2025 WL 1262054, at *2 (D.D.C. May 1, 2025) (impact of federal funding on ongoing AFSCME collective bargaining warranted TRO); *see also AFSCME*, 2025 WL 3018250, at *13 ("[u]nions also suffer injury from membership losses and loss of dues when their members are RIF'd, and they lose strength and bargaining power when their numbers are diminished."). Courts have similarly found irreparable harm in cases where plaintiffs show serious "'ongoing harms to their organizational missions,' including diversion of resources and the non-speculative loss of substantial funding." *Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, 780 F.Supp.3d 897, 925 (N.D. Cal. 2025) (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)).

The Targeted States Funding Freeze has already caused Plaintiffs and their members in the Targeted States irreparable harm, and that harm will continue if the freeze were permitted to take effect. The impacts of the freeze would cause immediate and catastrophic harm to children, their parents and families, home care workers, and owners and employees of day care facilities – many of whom are members of Plaintiffs' unions.

1

2

**A.  The Target State Funding Freeze Will Cause Severe and Irreparable Harm to the Child Care and Family Assistance Providers, Including Union Plaintiffs' Members**

3

4

If the Targeted States Funding Freeze were to go into effect, the child care and family assistance

5

system in the Targeted States would quickly be upturned. Freezing CCDF, SSBG, and TANF funds

6

would be devastating for owners and operators of child care centers that care for subsidy-eligible

7

children. Parents apply for federal subsidies with state and local intermediaries. Once deemed eligible,

8

families pay reduced tuition payments for child care for their children, and many attend for free; the

9

subsidies flow from the state to the provider. Benton Dec. (AFSCME) ¶ 4 (describing how subsidies

10

allow Plaintiff's member, a full-time healthcare worker, to pay subsidized rate of $65 each week for

11

child care instead of $250); Prado Dec. ¶¶ 4-5 (7 of 12 children enrolled at AFSCME members' child

12

care center receive 100% subsidy). Child care centers that accept subsidized payments in turn submit

13

attendance records for the children they provide care for to the relevant state and local agencies, for

14

which they are subsequently reimbursed. *Id*. at ¶ 4. As recounted in the accompanying declarations,

15

many eligible child care centers that accept children on subsidized tuition tend to have high

16

proportions of such clients, so the Targeted States Funding Freeze would be especially harmful

17

because federal subsidies comprise most or all the income streams at these centers. Cortez Dec.

18

(AFSCME) ¶ 4 (eighty percent of parents' pay tuition fully subsidized by federal funds); Rodriguez

19

Dec. (AFSCME) ¶ 7 (approximately 95% of students rely on federal subsidies); Bobadilla Dec.

20

(SEIU), at ¶ 6 (over eighty percent of parents rely on subsidies to afford child care); Sforza Dec.

21

(AFSCME) ¶¶ 47a-o (detailing examples of specific member-providers who derive much of their

22

income from New York State subsidies funded in part by CCDF); Prado Dec. (AFSCME) ¶¶ 4-5; Ex.

23

I, Declaration of Pamela Franks (SEIU) ¶¶ 6-7. These child care centers could not continue to operate

24

without federal subsidies that fund their clients' tuition. *See, e.g.*, Prado Dec. (AFSCME) ¶¶ 4-7; *see*

25

*also* Rodriguez Dec. (AFSCME) ¶¶ 8-11; Cortez Dec. (AFSCME). ¶¶ 5-7. Child care centers already

26

operate on thin margins, so many would be forced into closing their doors within weeks of a federal

27

funding freeze. Moreover, because states distribute federal funds through a reimbursement system,

28

participating child care centers have to seek reimbursement after they have spent funds, leaving them

with a short operating runway. The child care business model cannot afford any delays in program

reimbursements without immediate risks to the quality of care offered and basic ability to remain

open. As one declarant states:

> if those subsidies were to stop overnight, we would not be able to continue providing
> child care services to the families who rely on them. In turn, our ability to meet our
> regular operating costs would be jeopardized, and [we] would need to consider laying
> off or otherwise reducing staff." This would also impact our ability to care for those
> children enrolled … whose families do not receive child care subsidies.

Ex. J, Declaration of Nancy Harvey (SEIU) at ¶ 10; *see also* Cortez Dec. (AFSCME) ¶ 7 ("Losing

that subsidy would mean losing nearly my entire enrollment and being unable to cover expenses like

rent, payroll, food, or utilities"); Rodriguez Dec. (AFSCME) ¶ 11 (loss of federal subsidies would

cause closure within three months); Bobadilla Dec. (SEIU) ¶ 13. "[T]he threat of being driven out of

business is sufficient to establish irreparable harm." *HiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180,

1188 (9th Cir. 2022) (quoting *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470,

1474 (9th Cir. 1985)); *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) ("a substantial

loss of business" can constitute irreparable harm). Losing the business one has built is also personally

devastating, particularly in the day care context, when shuttering also means severing ties with the

children and families in whom the provider has invested time and care. Rodriguez Dec. (AFSCME)

¶¶ 16-18. If these child care centers were to close, teachers and staff, many of whom have dedicated

their entire careers to taking care of young children, will be left without jobs.

These child care centers depend on the reliability of federal funds to make basic decisions that

affect their staff, students, and parents. The uncertainty of federal funding caused by HHS's January

6 announcement has already disrupted the operations of child care centers. Cortez Dec. (AFSCME)

¶ 8 ("I have stopped purchasing new educational materials even though the students need

them, ranging from small everyday materials they use daily such as dolls, educational toys, fresh

paper and other art supplies, to larger purchases that are long overdue for my students such as new

tricycles for them to ride."); Rodriguez Dec. (AFSCME) ¶¶ 12-14 (provider has put on hold plans to

hire more staff, expand her business, and purchase everyday supplies); Prado Dec. (AFSCME) ¶ 6;

Franks Dec. (SEIU) ¶ 10; Harvey Dec. (SEIU) ¶ 11. Moreover, in both Illinois and New York City, Plaintiff AFSCME has members who work as staff at child care centers that rely on this federal money, and in Illinois the employer has specifically forecast that the freeze would cause reductions in the number of staff and "significantly limit access to full-day child care" provided by AFSCME members. Sforza Dec. (AFSCME) ¶¶ 32-33, 50. HHS's action is acutely stressing child care providers and staff, as the providers must continue paying staff, buy food and supplies, and pay rent, even though the security of their business and operations have been thrown into question, threatening all involved.

The Targeted States Funding Freeze will continue to harm these child care centers, their staff, and the children they care for in ways that cannot simply be made up in the future. Cortez Dec. (AFSCME) ¶ 7 ("the federal funding freeze would immediately endanger my business and my ability to earn any money at all for myself.").

**B.  The Targeted States Funding Freeze Impedes the Ability for Parents, Including Plaintiffs' Members, to Access Child Care and Supportive Services**

The impact of the Targeted States Funding Freeze would be immediately felt by parents, many of them members of Plaintiff Unions. Many low-income parents depend on the guarantee of federal subsidies to make child care affordable for them, enabling them to go to work and earn a living. Ex. K, Declaration of Christina Jackson (SEIU) at ¶ 9 ("If I didn't have access to subsidized child care, I could not have worked. I needed to have someone care for [my grandson] so I could provide for him."); Ex. N, Declaration of Anneisha Williams (SEIU) at ¶ 6 ("Child care assistance is what allows me to work and provide for my children. I currently work evening shifts at Jack in the Box. When I am at work, I am able to focus because I know my children are safe, loved, and cared for."); Bobadilla Dec. (SEIU) ¶ 14 (if the Targeted States Funding Freeze were to be effective, "[p]arents would also be forced to leave work, school, or training programs, disrupting their livelihoods and long-term opportunities.")

For these parents, simply the "thought of losing child care subsidies is terrifying." Williams Dec. (SEIU) at ¶ 8. As many declarants attest, the Child Care Funding Freeze will force them to make

impossible choices; for many, they would either need to quit their jobs to take care of their children, thereby abandoning hard-earned careers, or they would be fired based on their unavailability to work. Benton Dec. (AFSCME) ¶¶ 6, 8 ("Without the assistance I receive … I could not afford to send my son to his preschool program. I would have to quit my job and care for him at home. This would cause a cascade of negative effects," including leaving a fulfilling job that required certifications and training); *see also* Williams Dec. (SEIU) at ¶ 8; Jackson Dec. (SEIU) ¶¶ 6, 11. Parents and others responsible for caring for their loved ones will be unable to work, which will have direct effects on vulnerable families and on their broader communities. Preliminary relief is therefore "necessary to avoid irreparable harm to plaintiffs who will otherwise be forced to choose between abandoning their education [or quitting their jobs] or depriving themselves and their children of basic necessities in order to pay for child care." *Miller v. Carlson*, 768 F. Supp. 1331, 1340 (N.D. Cal. 1991).

### C. The Targeted States Funding Freeze Will Harm State and Local Government Employees, including Plaintiffs' Members

State and local employees tasked with administering the affected grant programs in the Targeted States stand to be harmed by HHS's actions. For example, staff at Colorado's Department of Early Childhood "process applications for assistance, monitor the quality of child care facilities, license child care providers, perform background checks on child care providers, administer the Children's Health Insurance Program ("CHIP"), and investigate fraud." Thurlkill Dec. (SEIU) ¶ 6. Salaries for this agency and similarly situated state and local agencies in each of the Targeted States will be lost if the Targeted States Funding Freeze were to take effect, as their salaries are reimbursed by the federal government. Thurlkill Dec. (SEIU) ¶¶ 6-7. This would reduce state and local agencies' abilities to respond to the needs of residents, many of whom will endeavor to find scarce alternative care options for their children and family members.

Plaintiff AFSCME's members work at state and county agencies that administer CCDF, TANF, and SSBG funds in each of the five affected states. Sforza Dec. (AFSCME) ¶¶ 5 (summarizing impacts on AFSCME members), Sforza Dec. (AFSCME) 5-13, 23-25, 30, 37-39, 49. The loss of this federal money will impact those members' jobs, including by putting them at risk of layoffs. For

1    instance, the Director of the Illinois Department of Human Services Division of Early Childhood has

2    warned Plaintiff AFSCME Council 31 that the freeze "will have immediate effects on efforts to plan

3    for the future, including planning future staffing and program operations." *Id.* ¶ 31. And officials in

4    Colorado have attested in sworn declarations that the funding freeze will require layoffs of staff who

5    administer these funds. *Id*. ¶ 24. When members lose these public service jobs, they lose the attendant

6    benefits, including health insurance, that go with them. *Id*. ¶ 28. And when members are laid off,

7    AFSCME in turns loses dues-paying members who not only contribute financially to the union and

8    thus its ability to advocate for fairness on behalf of its members but also contribute to its persuasive

9    strength. *Id*.

10        Right now, this funding uncertainty acutely undermines AFSCME's ability to bargain for

11   optimal working conditions for its members. When the employer is facing a budgetary shortfall of

12   this magnitude outside of its control, it affects AFSCME's bargaining strength and threatens to leave

13   workers with suboptimal terms and conditions of employment enshrined in a multi-year collective

14   bargaining agreement (CBA), which is happening in specific negotiations with employers of

15   AFSCME members that are ongoing right now. Sforza Dec. (AFSCME) ¶¶ 27, 33.

16   **III.    The Balance of Equities and Public Interest Weigh in Favor of Plaintiffs**

17        The balance of the equities and public interest, which merge when the government is a party,

18   *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024), strongly favor preliminary relief. The Targeted

19   States Funding Freeze threatens to irreparably harm Plaintiffs and their members, as well as many

20   others across all five states—like the day care centers, child care programs, parents, and young

21   children—who rely on these funds for critical child care and social services. *Supra*, Section II.

22   Conversely, Defendants face no "harm from an injunction that merely ends an unlawful practice."

23   *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d

24   1127, 1145 (9th Cir. 2013); *accord League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C.

25   Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."). To

26   the contrary, an injunction serves the interests of the general public where it ensures that federal

27   agency actions comply with federal law and the Constitution. *Am. Ass'n of Univ. Professors v. Trump*,

28   Pls.' Mem. ISO Mot. for Stay Under

No. 3:25-cv-07864, 2025 WL 3187762, at *43 (N.D. Cal. Nov. 14, 2025) (citing *League of Women Voters*, 838 F.3d at 12).

**CONCLUSION**

For the reasons discussed, Plaintiffs' motion should be granted.

Date: January 28, 2026

Respectfully submitted,

*/s/ Lorrie E. Bradley*
Lorrie E. Bradley (SBN 309411)
Peter M. McEntee (SBN 252075)
**BEESON, TAYER & BODINE**
492 Ninth Street, Suite 350
Oakland, CA 94607
lbradley@beesontayer.com
pmcentee@beesontayer.com

**Counsel for Plaintiffs**

*/s/ Teague Paterson*
Teague Paterson (SBN 226659)
Matthew Blumin (DC Bar No. 1007008)**
Georgina Yeomans (DC Bar No. 1510777)**
**AMERICAN FEDERATION OF STATE,**
**COUNTY, AND MUNICIPAL**
**EMPLOYEES, AFL-CIO (AFSCME)**
1625 L Street NW
Washington, DC 20036
(202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org
GYeomans@afscme.org

**Counsel for Plaintiff AFSCME**

*Admitted *pro hac vice*
**Motion for *pro hac vice* pending

*/s/ Yenisey Rodríguez*
Yenisey Rodríguez (DC Bar No. 1600574)*
Kevin E. Friedl (DC Bar No. 90033814)*
Cortney Robinson Henderson (DC Bar No. 1656074)*
Shiva Kooragayala (IL Bar No. 6336195)*
Joel McElvain (DC Bar No. 448431)*
Robin F. Thurston (DC Bar No. 1531399)*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 297-4810
yrodriguez@democracyforward.org
kfriedl@democracyforward.org
crhenderson@democracyforward.org
skooragayala@democracyforward.org
jmcelvain@democracyforward.org
rthurston@democracyforward.org

**Counsel for Plaintiffs**

*/s/ Steven K. Ury*
Steven K. Ury (SBN 199499)
**SERVICE EMPLOYEES**
**INTERNATIONAL UNION, AFL-CIO**
1800 Massachusetts Avenue NW
Washington, DC 20036
(202) 730-7424
steven.ury@seiu.org

**Counsel for Plaintiff SEIU**

Pls.' Mem. ISO Mot. for Stay Under
5 U.S.C. § 705 and Preliminary Injunction

Case No. 3:26-cv-00759

1

## **CERTIFICATE OF SERVICE**

2

Pursuant to Civil Local Rule 5-5, I hereby certify that on January 28, 2026, I caused the

3

foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, and served

4

by certified mail to the following:

5

/s/ *Yenisey Rodriguez*
Yenisey Rodriguez

6

7

**U.S. DEPARTMENT OF**
**HEALTH AND HUMAN SERVICES**

8

Hubert H. Humphrey Building
200 Independence Avenue, S.W.

9

Washington, D.C. 20201

**UNITED STATES ATTORNEY'S OFFICE**
**FOR THE NORTHERN DISTRICT OF**
**CALIFORNIA**
c/o Civil Process Clerk U.S. Attorney's Office,
N. District of California
450 Golden Gate Avenue
San Francisco, CA 94102-3495

10

**Robert F. Kennedy, Jr., in his official**
**capacity as Secretary of the U.S.**

11

**Department of Health and Human**
**Services**

12

U.S. Department of Health and Human
Services

13

Hubert H. Humphrey Building
200 Independence Avenue, S.W.

14

Washington, D.C. 20201

15

**PAM BONDI, U.S. ATTORNEY GENERAL**
U.S. Department of Justice
Justice Management Division
950 Pennsylvania Ave, NW, Room 1111
Washington, D.C. 20530

16

**Administration for Children and**
**Families**

17

Mary E. Switzer Building
330 C Street, S.W.

18

Washington, D.C. 20201

19

20

**Alex J. Adams, in his official capacity as**
**Assistant Secretary of the Administration**
**for Children and Families,**

21

Administration for Children and Families
Mary E. Switzer Building

22

330 C Street, S.W.
Washington, D.C. 20201

23

24

25

26

27

28

Pls.' Mem. ISO Mot. for Stay Under
5 U.S.C. § 705 and Preliminary Injunction

Case No. 3:26-cv-00759